PATRICIA E. BROPHY vs. NEW ENGLAND SINAI HOSPITAL, INC.

Norfolk. May 7, 1986. — September 11, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Incompetent Person,* Consent to medical treatment, Right to refuse medical
   treatment. *Probate Court,* Incompetent person, Withholding medical
   treatment. *Medicine,* Withholding medical treatment. *Privacy.*

With respect to a hospital patient who, as the result of irreversible brain
   damage, had been in a vegetative state for more than three years and
   who, when in good health, had expressed his desire not to be maintained
   in a persistent vegetative state, this court, applying the substituted judg-
   ment doctrine articulated in *Superintendent of Belchertown State School
   v. Saikewicz,* 373 Mass. 728 (1977), concluded that the patient could
   lawfully be removed by his guardian from a hospital which had refused
   to cease providing him with nutrition and hydration by artificial means
   and be placed in a different facility, or in his home, where his expressed
   wishes could be effectuated. [419-423] NOLAN, J., dissenting. LYNCH,
   J., dissenting in part. O'CONNOR, J., concurring in part and dissenting
   in part.
Discussion of the right of a patient to refuse medical treatment, as applicable
   to one who is in a persistent vegetative state as the result of irreversible
   brain damage; who is being sustained by nutrition and hydration supplied
   to him through a surgically-inserted gastrostomy tube; and who is unlikely
   ever to regain cognitive function, the ability to communicate, or the
   capability of interacting purposefully with his environment, but who is
   neither terminally ill nor facing imminent death from any other medical
   cause. [429-433]
In the case of an incompetent hospital patient who was diagnosed as being
   in a persistent vegetative state, but who was neither terminally ill nor
   facing imminent death from any medical cause, the Commonwealth's
   interest in preserving life did not override the patient's substituted judg-
   ment decision which would be to discontinue receiving nutrition and
   hydration through a surgically-inserted gastrostomy tube. [433-438]
   NOLAN, J., LYNCH, J., and O'CONNOR, J., dissenting.
In the case of an incompetent hospital patient who was diagnosed as being
   in a persistent vegetative state, but who was neither terminally ill nor
   facing imminent death from any medical cause, the Commonwealth's
   interest in preventing suicide was inapplicable to override the patient's

substituted judgment decision to discontinue receiving nutrition and hydration through a surgically-inserted gastrostomy tube, inasmuch as the patient's resulting death would be from the natural medical causes preventing him from being sustained without the use of the tube, and not from a cause set in motion or intended by the patient or on his behalf. [438-439] NOLAN, J., LYNCH, J., and O'CONNOR, J., dissenting.

Where neither a hospital nor any medical professional was to be required to participate in giving effect to the substituted judgment decision of a certain patient, who was in a persistent vegetative state, to discontinue receiving nutrition and hydration through a surgically-inserted gastrostomy tube, a Probate Court judgment which would allow the patient's guardian to remove him to a different facility, or to his home, where his wishes could be effectuated, would present no violation of the ethical integrity of the hospital or its staff. [439-441] NOLAN, J., and LYNCH, J., dissenting. O'CONNOR, J., concurring.

CIVIL ACTION commenced in the Norfolk Division of the Probate and Family Court Department on February 6, 1985.

The case was heard by *David H. Kopelman,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Frank E. Reardon (Nancy R. Rice & Judith A. Johnson* with him) for the plaintiff.

*Elaine M. Moriarty* for the defendant.

*Peter W. Gubellini* for the ward.

*John G. Dugan* for the guardian ad litem.

The following submitted briefs for amici curiae:

*Anne W. Hogeland & John Traficonte* for American Academy of Neurology.

*Carol J. Weil* of the District of Columbia for Massachusetts Chapter of American College of Physicians.

*Dennis J. Horan, Edward R. Grant, Clarke D. Forsythe & Ann-Louise Lohr* of Illinois & *J. Michael Roberts* for certain fellows and members of Massachusetts Medical Society & others.

*Elena N. Cohen & Fenella Rouse* of New York for Society for the Right to Die, Inc.

*Charles H. Baron & Marjorie Heins* for Civil Liberties Union of Massachusetts.

*William Crane & Jonathan Brant* for Developmental Disabilities Law Center, Inc.

*George J. Annas & Leonard H. Glantz* for Concern for Dying.

LIACOS, J. We are asked to decide whether the substituted judgment of a person in a persistent vegetative state that the artificial maintenance of his nutrition and hydration be discontinued shall be honored. The effectuation of the ward's wishes is supported by his wife-guardian and his family, but is opposed by his attending physicians and the defendant hospital. We are faced again with a case where "[a]dvances in medical science have given doctors greater control over the time and nature of death" and where physicians have developed a "range of options . . . to postpone death irrespective of the effect on the patient." *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 737 (1977). We recognize that "[t]he case . . . raises moral, social, technological, philosophical, and legal questions involving the interplay of many disciplines. No one person or profession has all the answers." *Matter of Conroy,* 98 N.J. 321, 344 (1985).

Sensitive to the significance and complexity of our decision, we do not shirk our responsibility, for we are aware that the advances of medical science and technology are "compelling the public, through the courts, if not the legislatures, to formulate new standards and procedures for measuring the conduct of persons involved in the health care of persons with irreversible brain damage." *Severns* v. *Wilmington Medical Center, Inc.,* 421 A.2d 1334, 1344 (Del. 1980).[1] It has been said that "we are on the threshold of new terrain — the penumbra where death begins but life, in some form, continues. We have been led to it by the medical miracles which now compel us to distinguish between 'death,' as we have known it, and death in which the body lives in some fashion but the brain (or a

---

[1] Thus, "the drive to sustain life can conflict with another fundamental (arguably more venerable) objective of medicine — the relief of suffering." President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 15 (1983) (hereinafter, President's Commission Report).

significant part of it) does not." *Id.* See, in accord, *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006, 1014 (1983).[2]

In *Saikewicz, supra,* and cases following it, we have been confronted with some of the legal implications of these new medical advances, as had been the Supreme Court of New Jersey earlier in *Matter of Quinlan,* 70 N.J. 10, cert. denied sub nom. *Garger* v. *New Jersey,* 429 U.S. 922 (1976). We have determined that, in certain circumstances, further medical treatment may be discontinued. The Supreme Court of New Jersey has recently restated the dilemma: "As scientific advances make it possible for us to live longer than ever before, even when most of our physical and mental capacities have been irrevocably lost, patients and their families are increasingly asserting a right to die a natural death without undue dependence on medical technology or unnecessarily protracted agony — in short, a right to 'die with dignity.' " *Matter of Conroy, supra* at 343.[3] It is in this context that we turn to consider the facts and the law applicable to this appeal.

---

[2] "It is now possible to hold such persons on the threshold of death for an indeterminate period of time by utilizing extraordinary mechanical or other artificial means to sustain their vital bodily functions. The procedures used can be accurately described as a means of prolonging the dying process rather than a means of continuing life." *John F. Kennedy Memorial Hosp., Inc.* v. *Bludworth,* 452 So.2d 921, 923 (Fla. 1984).

[3] The President's Commission Report reveals that, between 1900 and 1983, the causes and the places of death have changed dramatically. Death caused by communicable disease has declined sharply; most deaths now are caused by heart disease, cancer, and cerebrovascular disease or illness — "illnesses that occur later in life and that are ordinarily progressive for some years before death." *Id.* at 16. Institutional settings (hospitals and nursing homes) were the sites of 50% of all deaths in 1949, of over 70% by 1977, and, by 1983, of over 80%. *Id.* at 17-18. The Commission, thus, has stated: "Once someone realizes that the time and manner of death are substantially under the control of medical science, he or she wants to be protected against decisions that make death too easy and quick as well as from those that make it too agonizing and prolonged." *Id.* at 23. The Commission notes, also, that "[f]or almost any life-threatening condition, some intervention can now delay the moment of death." *Id.* at 1.

1. *The Facts.*

a. *The medical incident and initial proceedings.* Paul E. Brophy, Sr. (Brophy), was afflicted on March 22, 1983, by the rupture of an aneurysm located at the apex of the basilar artery. Prior to that time, Brophy had been a healthy, robust man, who had been employed by the town of Easton as a fireman and emergency medical technician. He enjoyed deer hunting, fishing, gardening, and performing household chores. About midnight on March 22, 1983, he complained to his wife, Patricia, of a severe, "splitting" headache. He became unconscious. His wife called the Easton fire department, and Brophy was transported to Goddard Hospital. An angiogram at Goddard Hospital revealed the aneurysm. Surgery ensued on April 6, 1983, but was not successful. He has never regained consciousness. Brophy is now in a condition described as a "persistent vegetative state."[4] He is unable to chew or swallow, and is maintained by an artificial device, surgically inserted on December 22, 1983, known as a gastrostomy tube (G-tube) through which he receives nutrition and hydration. On June 28, 1983, he was transferred to the New England Sinai Hospital (hospital), where he remains as a patient.

---

[4] A physician who performed a neurological evaluation of Brophy testified that a persistent vegetative state is a condition in which the patient:

"(a) shows no evidence of verbal or non-verbal communication;
"(b) demonstrates no purposeful movement or motor ability;
"(c) is unable to interact purposely with stimulation provided by his environment;
"(d) is unable to provide for his own basic needs;
"(e) demonstrates all of the above for longer than three months."

This definition is consistent with the description of a persistent vegetative state in the President's Commission Report, which also states: "Most of what makes someone a distinctive individual is lost when the person is unconscious, especially if he or she will always remain so. Personality, memory, purposive action, social interaction, sentience, thought, and even emotional states are gone. Only vegetative functions and reflexes persist. If food is supplied, the digestive system functions, and uncontrolled evacuation occurs; the kidneys produce urine; the heart, lungs, and blood vessels continue to move air and blood; and nutrients are distributed in the body." (Footnote omitted.) *Id.* at 174-175.

Brophy's wife and family wish the G-tube removed or clamped. When the physicians and hospital refused, litigation was commenced by Brophy's wife in the Probate and Family Court Department. A judge of the Probate Court,[5] after extensive hearings, found that Brophy, now incompetent, would, if competent, decline to receive food and water in this manner, and that Brophy's wife and guardian, Patricia E. Brophy, and his family and relatives agree with this choice. Nevertheless, the judge ordered the continuation of nutrition and hydration by use of the G-tube and enjoined both the hospital and the guardian from removing or clamping the tube. We now set aside the judgment and remand the case for entry of a new judgment. In doing so, we sustain that portion of the judgment which respects the right of the hospital to refuse to remove or clamp the G-tube, but authorize the guardian to remove Brophy

---

[5] The procedural facts are summarized as follows: On February 6, 1985, Brophy's wife, in her capacity as legal guardian for her husband, filed a complaint for declaratory judgment in the Probate Court for Norfolk County requesting, inter alia, a judgment granting her the authority to order discontinuance of all life sustaining treatment for her husband, including artificial nutrition and hydration. On the same day the complaint was filed, a judge in the Probate Court ordered the treating physicians to continue all life sustaining measures until further order of the court. The judge also appointed John Dugan as guardian ad litem-investigator, and ordered him to report to the court concerning the matter.

On February 8, 1985, pursuant to an order of the Probate Court, the plaintiff filed an amended complaint which named the hospital as defendant. On March 4, 1985, the hospital answered the amended complaint. On May 21, 1985, the hospital filed a motion to dismiss the complaint, and a motion to substitute the guardian ad litem as the proper party defendant. The motion to dismiss was docketed but not heard; the motion to substitute was denied. Evidentiary hearings were held on May 22, 23, 24, 28, 29, 30, and 31, 1985. On July 19, 1985, the plaintiff moved to reopen the evidence. The motion was allowed, and additional testimony was taken on September 4, 1985. On October 21, 1985, the probate judge issued extensive findings of fact, conclusions of law, and judgment consistent therewith. Originally, the probate judge stated that the motion to dismiss was not formally presented to the court and was, accordingly, not acted upon. On November 29, 1985, in entering judgment with respect to the defendant's motion to amend the procedural background, the judge stated that the motion to dismiss was denied nunc pro tunc. The plaintiff filed a notice of appeal on December 4, 1985, and on December 20, 1985, the defendant appealed from the denial of its motion to dismiss. We transferred the case to this court on our own motion.

from the hospital to the care of other physicians who will honor Brophy's wishes.

b. *The medical facts*. Diagnostic techniques utilized to determine the nature of Brophy's illness revealed subarachnoid bleeding in the posterior fossa surrounding the upper brain stem. Later, an angiogram revealed an aneurysm located at the apex of the basilar artery. On April 6, 1983, Brophy underwent a right frontotemporal craniotomy. Shortly after surgery, he received several CT scans which showed extensive damage, namely, complete infarction of his left posterior cerebral artery and infarction of the right temporal lobe of the brain. After surgery, he initially received nutrition by means of a nasogastric tube.

On June 28, 1983, Brophy was transferred to the New England Sinai Hospital. He received intensive physical and speech therapy for about three to four weeks. After he showed no response to that therapy, it was permanently discontinued. On July 7, 1983, Doctor Ferey Shahrokhi diagnosed Brophy as being in a "semi-vegetative or vegetative state."[6] In August, 1983, he contracted pneumonia, and the hospital requested his wife's instructions regarding a "do not resuscitate" order (DNR order) in the event of a cardiac arrest. Mrs. Brophy requested a DNR order, and one was entered on his chart.

On December 21, 1983, Brophy was transferred to the Cardinal Cushing General Hospital, with the consent of his wife, and on December 22, 1983, he underwent a surgical procedure in which a G-tube was inserted through a stoma in the abdominal wall into the stomach to provide him with nutrition and hydration. On December 29, 1983, he was discharged from the Cardinal Cushing General Hospital and was readmitted into the New England Sinai Hospital.

---

[6] During the consultation, Brophy showed no response to verbal stimuli, but his right eye opened at times in response to painful stimuli. He made "slight but appropriate movement in both upper extremities" when pressure was applied to his sternum. He also withdrew his feet when they were pricked by a pin.

Although Brophy is not technically brain dead,[7] he has suffered serious and irreversible damage to his brain.[8] Some areas of his brain remain undamaged[9] but have been stranded and left dysfunctional.[10] The damage makes him unable to integrate input from his environment, and to commence voluntary activity; he lacks cognitive functioning such as reasoning.[11] Although his body responds to certain stimuli, it is probable that the actions are reflexive and do not result from cognitive activ-

[7] The probate judge cited three basic criteria for brain death, in line with the Harvard ad hoc committee's 1968 definition: "(a) unresponsiveness to normally painful stimuli; (b) absence of spontaneous movements or breathing; and, (c) absence of reflexes." None of those criteria apply to Brophy.

[8] The probate judge recounted the damage:

"(a) The left side of his thalamus is 90% destroyed.
"(b) The right side of his thalamus is 20% destroyed.
"(c) There is damage to his left temporal lobe.
"(d) There is damage to his left occipital lobe.
"(e) Fifty percent of his left parietal lobe has been destroyed.
"(f) The anterior aspect of his right temporal lobe has been damaged.
"(g) The medial portion of his mid-brain has been damaged, with a resulting loss of mid-brain tissue."

Brophy also suffers from a condition known as hydrocephalus — the excessive accumulation of cerebral spinal fluid inside the skull. This condition could be relieved somewhat by surgery, but the probate judge found that the surgical procedure involved would be highly invasive, would produce only minor improvement, and would not, in all probability, restore his cognitive function.

[9] The areas not damaged include: (a) his frontal lobes; (b) his right parietal lobe; (c) his right occipital lobe; (d) fifty per cent of his left parietal lobe; (e) the lower portion of his brain stem; (f) the bulk of the cortex.

An electroencephalogram (EEG) performed on April 13, 1984, was abnormal, but did indicate controlled electrical activity generated by millions of cortical neurons, which were normal.

[10] Brophy's cerebral cortex, which controls thought and intellectual process, integrates input from his environment, and commences and controls voluntary body activity, is largely intact. However, in order to function, the cortex requires stimulation from the thalamus, which conducts impulses to the cortex.

[11] The probate judge found that it is presently not known with any reasonable degree of medical certainty whether he is able to experience physical pain and suffering. The judge was able to find, however, that it is highly improbable that he is capable of experiencing mental anguish because the cognitive portion of his brain is not functioning.

ity.[12] He appears to be comfortable, and, on the occasions when he shows signs of discomfort,[13] it appears that medication ameliorates that discomfort.

According to the testimony of Dr. Ronald Cranford, who has made extensive studies regarding the condition of persistent vegetative state,[14] the likelihood of Brophy's regaining cognitive functioning is substantially less than one per cent.[15] The probate judge found that it is highly unlikely that he will ever regain cognitive behavior, the ability to communicate, or the capability of interacting purposefully with his environment.

Apart from the extreme injury to his brain, Brophy's other organs are functioning relatively well. The judge found that he is not terminally ill, nor is he in danger of imminent death from any other medical cause.[16] It appears that he may live in a persistent vegetative state for several years, although a non-aggressive treatment plan will probably shorten his life.

Brophy is dependent on the G-tube for life sustaining nutrition and hydration. The G-tube is a pliable silicone tube, about one and one-half feet in length with two openings at the top.

---

[12] Mostly, Brophy shows simplified and stereotyped reactions and reflexes, regardless of the stimulus applied. He is unable to communicate by eye movement, facial expression, or purposeful body movement, and appears incapable of verbal or nonverbal communication.

[13] The signs of discomfort are that he makes more rapid body motions, appears more animated, and displays rapid eye movement.

[14] Brophy does not have a typical form of persistent vegetative state. Usually ischemia, the lack of blood flow to the higher centers of the brain, particularly the cortex, results in damage to those areas, causing a persistent vegetative state. His damage is located primarily in the lower centers of the brain, mainly the thalamus.

[15] Doctor Cranford was aware of only two cases in the literature where patients in a persistent vegetative state for over one month regained cognitive awareness. Doctor Cranford testified that neither of the two individuals recovered completely: "They were left in a state that some people, including myself . . . would [view] as worse than the vegetative state."

[16] Brophy breathes on his own, without a respirator, although he does have a tracheostomy tube in his trachea. This permits removal of excess secretions which could plug his airways. That tube does not operate mechanically. All of his other major organs function normally and without mechanical assistance.

Food enters the larger[17] opening of the G-tube via plastic tubing, some two and one-half feet long, which in turn is connected to a plastic bag which hangs above the level of the patient (allowing the liquid food[18] to flow from that bag by means of gravity into the G-tube). Brophy is fed four times a day, by a nurse who pours liquid food into the plastic bag. Nothing mechanical regulates the flow of food from the bag to the plastic tubing to the G-tube to his stomach.

While the use of a G-tube can have certain adverse side effects, the judge found that Brophy had experienced none of the adverse side effects during a period of approximately eighteen months. The judge found that it is not likely that he will experience complications in the future. The judge concluded that now that the G-tube is in place, it is the least intrusive, least invasive, and most problem-free way of providing nutrition and hydration to him.[19] Brophy shows no signs or symptoms of discomfort as a result of the use of the G-tube. The judge found that utilization of the G-tube is not "painful, uncomfortable, burdensome, unusual, hazardous, invasive or intrusive," even in relation to a conscious patient.

Removal of the G-tube likely would create various effects resulting from the lack of hydration and nutrition, leading ultimately to death. The judge found that death by dehydration is extremely painful and uncomfortable for a human being.[20]

---

[17] The G-tube also has a smaller opening which is used to help keep the G-tube from slipping out of the stoma.

[18] The liquid food is similar to baby food and includes the hydration which Brophy requires to survive.

[19] Other methods of providing artificial means of nutrition and hydration are intravenous feeding, central hyperalimentation, nasogastric tubes, and surgical procedures. These methods, and their shortcomings, are discussed in *Matter of Hier*, 18 Mass. App. Ct. 200, 203-206 (1984). The probate judge considered these methods and concluded that continuation of the G-tube to be the least intrusive for Brophy.

[20] The judge concluded that the possibility that Brophy would experience a painful death "cannot be ruled out." This finding apparently was based on the testimony of Brophy's attending physician and seems inconsistent with the judge's findings as to the nature of Brophy's persistent vegetative state. See note 4, *supra*. The American Academy of Neurology, as amicus, claims in its brief that patients in a persistent vegetative state, like Brophy,

Brophy requires constant care. He receives seven and one-half hours of nursing care each day. He has no control of his muscles or movements. The judge found that his care by others consists of "bathing, shaving, mouth care, grooming, caring for his bowels and bladder, changing his bed linens and clothing, turning him in bed to prevent bedsores and providing him with food and hydration through the G Tube."[21]

c. *The finding as to substituted judgment.* The judge found on the basis of ample evidence which no one disputes, that Brophy's judgment would be to decline the provision of food and water and to terminate his life. In reaching that conclusion, the judge considered various factors including the following: (1) Brophy's expressed preferences; (2) his religious convictions and their relation to refusal of treatment; (3) the impact on his family; (4) the probability of adverse side effects; and (5) the prognosis, both with and without treatment. The judge also considered present and future incompetency as an element which Brophy would consider in his decision-making process.

---

do not experience pain and suffering. They observe that this is so because, inter alia, studies in the field have indicated to date that a characteristic of the persistent vegetative state is "overwhelming bilateral damage to the cerebral hemispheres to a degree incompatible with consciousness or the capacity to experience pain or suffering." See Dougherty, Rawlinson, Levy & Plum, Hypoxic-ischemic brain injury and the vegetative state: Clinical and neuropathologic correlation, 31 Neurology 991, 995 (1981). This view also was expressed by Drs. Butler and Cranford in their testimony before the Probate Court. Additionally, such a finding appears in conflict with much of the literature in the field. See President's Commission Report at 181-182 ("Pain and suffering are absent, as are joy, satisfaction, and pleasure"). See also *Matter of Conroy,* 98 N.J. 321, 394-395 (1985) (Handler, J., concurring in part and dissenting in part).

[21] In *Matter of Conroy, supra* at 398-399, Judge Handler, in his separate opinion, describes this condition: "[T]he medical and nursing treatment of individuals . . . suffering from these conditions entails the constant and extensive handling and manipulation of the body. At some point, such a course of treatment upon the insensate patient is bound to touch the sensibilities of even the most detached observer. Eventually, pervasive bodily intrusions, even for the best motives, will arouse feelings akin to humiliation and mortification for the helpless patient."

The judge relied on several statements made by Brophy prior to the onset of his illness.[22] Although he never had discussed specifically whether a G-tube or feeding tube should be withdrawn in the event that he was diagnosed as being in a persistent vegetative state following his surgery, the judge inferred that, if presently competent, Brophy would choose to forgo artificial nutrition and hydration by means of a G-tube. The judge found that Brophy would not likely view his own religion as a barrier to that choice.

Brophy's wife and guardian, Patricia, in reaching her decision that her husband's "life is over" went through long and agonizing research, reflection, and prayer. She discussed her decision with family and clergy.[23] She has performed her duties as guardian and spouse with the highest degree of ethical and moral exaction.

The matter was also thoroughly investigated by the guardian ad litem, who made three reports. He recommended to the court that the G-tube not be removed, that a DNR order be entered on Brophy's chart, and that a nonaggressive treatment plan be implemented in the event of a life-threatening infection.[24]

---

[22] About ten years ago, discussing Karen Ann Quinlan, Brophy stated to his wife, "I don't ever want to be on a life-support system. No way do I want to live like that; that is not living." He had a favorite saying: "When your ticket is punched, it is punched." Approximately five to six years ago, he helped to rescue from a burning truck a man who received extensive burns and who died a few months later. He tossed the commendation he received for bravery in the trash and said, "I should have been five minutes later. It would have been all over for him." He also said to his brother regarding that incident, "If I'm ever like that, just shoot me, pull the plug." About one week prior to his illness, in discussing a local teenager who had been put on a life support system he said, "No way, don't ever let that happen to me, no way." Within twelve hours after being transported to Goddard Hospital following the rupture of the aneurysm, he stated to one of his daughters, "If I can't sit up to kiss one of my beautiful daughters, I may as well be six feet under."

[23] Patricia Brophy has discussed her husband's situation with her parish priest. He believes that her decision is based on love and compassion (and the judge agrees, as do we) for both her husband and her family. Her decision was not based in any way on financial considerations. There would be no adverse impact on third parties such as minor children, and Patricia Brophy has the support of her family and relatives in her decision.

[24] Such orders are incorporated in the judgment and are not in issue on this appeal.

Doctor Lajos Koncz, Brophy's attending physician, refused to carry out Patricia Brophy's request because it is his belief that he would wilfully be causing Brophy's death. Dr. Koncz discussed the matter with the medical and nursing staff at the hospital, who essentially agreed with his opinion. Dr. Richard Field, physician-in-chief at the hospital, took the position that he could not, personally or officially, comply with the request because it would constitute a harmful act which would deliberately produce death. The medical executive committee and the board of directors of the hospital indorsed the position of Drs. Field and Koncz. The board of directors, however, was not opposed to transferring Brophy to another medical institution if the Probate Court authorized and ordered the removal of the G-tube. A significant portion of the medical community disagrees with New England Sinai Hospital and considers it appropriate to withhold hydration and nutrition from individuals like Brophy when that is the wish of the patient and his family. See notes 37 and 38, *infra*.

2. *The law*.

a. *The right to refuse treatment*. We begin with the recognition that we are involved in a difficult and demanding area of the law in which each case presents issues of fundamental importance that require more than the mere "mechanical reliance on legal doctrine." *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728, 736 (1977). We encourage and seek insights and "the collective guidance of those in health care, moral ethics, philosophy, and other disciplines." *Id*.[25] We share a concern with the hospital, the guardians, the physicians, and the amici curiae for acting in the best interests of the patient. See *id*. at 737. We are aided by our determination that the issue in the case at hand is narrowly drawn and is limited solely to whether the substituted judgment of an incompetent patient-ward in a persistent vegetative state to refuse the continuance of artificial means of nutrition and hydration should be honored.

[25] We have not been disappointed, and once again we have been aided by the work of the parties and the Probate Court judge and the outstanding briefs filed by the amici curiae.

The right of a patient to refuse medical treatment arises both from the common law and the unwritten and penumbral constitutional right to privacy. See *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass. 152, 154 (1982); *Matter of Spring,* 380 Mass. 629, 634 (1980); *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 261 (1979); *Saikewicz, supra* at 738-740. The common law's implicit recognition that "a person has a strong interest in being free from nonconsensual invasion of his bodily integrity," *id.* at 739, is now explicit in this Commonwealth. See *Harnish* v. *Children's Hosp. Medical Center, supra.*

"The law protects [a person's] right to make [his] own decision to accept or reject treatment, whether that decision is wise or unwise." *Lane* v. *Candura,* 6 Mass. App. Ct. 377, 383 (1978). Cf. *Commissioner of Correction* v. *Myers, supra* at 261, 263-264. This right has come to be widely recognized and respected by the courts of this nation. See, e.g., *Rasmussen* v. *Fleming,* 154 Ariz. 200,      (1986) (741 P.2d 667, 670-671 [Ariz. App. 1986]), and cases cited;[26] *Bartling* v. *Superior Court,* 163 Cal. App. 3d 186, 195 (1984); *Matter of Conroy,* 98 N.J. 321, 346-347 (1985); *Matter of Storar,* 52 N.Y.2d 363, 376-377 (1981).

The right of self-determination and individual autonomy has its roots deep in our history. John Stuart Mill stated the concept succinctly: "[T]he only purpose for which power can be rightfully exercised over any member of a civilised community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be wise, or even right." Mill, On Liberty, in 43 Great Books of the Western World 271 (R. Hutchins ed. 1952), quoted in *In re Caulk,* 125 N.H. 226, 236 (1984) (Douglas, J., dissenting).

It is in recognition of these fundamental principles of individual autonomy that we sought, in *Saikewicz,* to shift the

---

[26] We note that a petition for review of the *Rasmussen* case has been submitted to the Arizona Supreme Court.

emphasis away from a paternalistic view of what is "best" for a patient toward a reaffirmation that the basic question is what decision will comport with the will of the person involved, whether that person be competent or incompetent. As to the latter type of person, we concluded that the doctrine of substituted judgment, while not without its shortcomings, best serves to emphasize the importance of honoring the privacy and dignity of the individual.[27] Thus, we stated that "we recognize a general right in all persons to refuse medical treatment in appropriate circumstances. The recognition of that right must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity extends to both." *Saikewicz, supra* at 745. We emphasized further, that "[i]t does not advance the interest of the State or the ward to treat the ward as a person of lesser status or dignity than others. To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons." *Id.* at 746. This theme has reappeared in many of our recent decisions where the protection of rights of an incompetent person was at stake. A

[27] The Florida Supreme Court has recognized the importance of honoring the privacy and dignity of both competent and incompetent persons. As to a competent person suffering from Lou Gehrig's disease (amyotrophic lateral sclerosis), who sought removal of a respirator, the court in *Satz* v. *Perlmutter,* 379 So.2d 359 (Fla. 1980), adopted the opinion of its District Court of Appeal, 362 So.2d 160 (Fla. Dist. Ct. App. 1978), and its language as follows: "It is all very convenient to insist on continuing Mr. Perlmutter's life so that there can be no question of foul play, no resulting civil liability and no possible trespass on medical ethics. However, it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting never ending physical torture on his body until the inevitable, but artificially suspended, moment of death. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determine." 362 So.2d at 164.

Later, in *John F. Kennedy Memorial Hosp., Inc.* v. *Bludworth,* 452 So. 2d 921, 924 (Fla. 1984), the Florida Supreme Court, having quoted the above passage with approval, stated, as to an incompetent person: "This right of terminally ill patients should not be lost when they suffer irreversible brain damage, become comatose, and are no longer able to personally express their wishes to discontinue the use of extraordinary artificial support systems."

significant aspect of this right of privacy is the right to be free of nonconsensual invasion of one's bodily integrity. *Matter of Spring, supra.* See *Custody of a Minor (No. 1),* 385 Mass. 697, 710 (1982); *Matter of Moe,* 385 Mass. 555, 564-565 (1982); *Matter of Hier,* 18 Mass. App. Ct. 200, 207 (1984); *Lane* v. *Candura, supra.* See also President's Commission Report, *supra* at 121 ("In general, a person's choices regarding care ought to override the assessments of others about what best serves that person"). *Id.* at 136 ("decisionmaking for incapacitated patients should be guided by the principle of substituted judgment, which promotes the underlying values of self-determination . . . ").

The right to refuse medical treatment in life threatening situations is not absolute. *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 261-262 (1979). *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 740-741 (1977). *Matter of Conroy, supra* at 348. We have noted, however, that "the State's interest in the preservation of life does not invariably control the right to refuse treatment in cases of positive prognosis." *Commissioner of Correction* v. *Myers, supra* at 263. See *Lane* v. *Candura, supra* (recognizing a competent person's right to refuse amputation of a gangrenous leg). We have recognized at least four countervailing State interests: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. *Saikewicz, supra* at 741. See *Matter of Spring, supra* at 641; *Matter of Hier, supra* at 210. Other State courts have identified and applied similar State interests. See *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127, 1142 (1986); *Foody* v. *Manchester Memorial Hosp.,* 40 Conn. Supp. 127, 133 (Super. Ct. 1984); *John F. Kennedy Memorial Hosp., Inc.* v. *Bludworth,* 452 So.2d 921, 924 (Fla. 1984). *Matter of Conroy, supra* at 348-349, and cases cited. Cf. *In re L.H.R.,* 253 Ga. 439, 446 (1984); *Leach* v. *Shapiro,* 13 Ohio App. 3d 393, 395 (Ct. App. 1984). Where appropriate, we have been willing to consider other State interests as well, particularly when they are specifically related to the right to privacy. See *Commis-*

*sioner of Correction* v. *Myers, supra* at 264 (Commonwealth's interest in upholding orderly prison administration decisive against prisoner's assertion of privacy rights).

We have contended that the primary goal of the substituted judgment standard is "to determine with as much accuracy as possible the wants and needs of the individual involved." *Saikewicz, supra* at 750. The parties do not contest that the evidence was sufficient to support the judge's findings concerning Brophy's subjective viewpoint. We agree.

Accepting that Brophy's substituted judgment would be to discontinue providing nutrients through the G-tube, we are left only with the question whether the Commonwealth's interests require that his judgment be overridden. It is natural to begin with the most significant interest in this case, the interest in the preservation of life. See *Saikewicz, supra* at 741; *Commissioner of Correction* v. *Myers, supra* at 262; *Matter of Conroy,* 98 N.J. 321, 349 (1985).

The concern for the preservation of the life of the patient normally involves an interest in the prolongation of life. Thus, the State's interest in preserving life is very high when "human life [can] be saved where the affliction is curable." *Saikewicz, supra* at 742. That interest wanes when the underlying affliction is incurable and would "soon cause death regardless of any medical treatment." *Commissioner of Correction* v. *Myers, supra* at 262. *Saikewicz, supra.* The calculus shifts when the issue is not "whether, but when, for how long, and at what cost to the individual that life may be briefly extended." *Id. Commissioner of Correction* v. *Myers, supra.*[28]

When we balance the State's interest in prolonging a patient's life against the rights of the patient to reject such prolongation,

---

[28] "The general State interest in the preservation of life — most weighty where the patient, properly treated, can return to reasonable health, without great suffering, and a decision to avoid treatment would be aberrational — carries far less weight where the patient is approaching the end of his normal life span, where his afflictions are incapacitating, and where the best that medicine can offer is an extension of suffering." *Matter of Spring,* 8 Mass. App. Ct. 831, 845-846 (1979), rev'd on other grounds, 380 Mass. 629 (1980).

we must recognize that the State's interest in life encompasses a broader interest than mere corporeal existence. In certain, thankfully rare, circumstances the burden of maintaining the corporeal existence degrades the very humanity it was meant to serve. The law recognizes the individual's right to preserve his humanity, even if to preserve his humanity means to allow the natural processes of a disease or affliction to bring about a death with dignity.[29] In stating this, we make no judgment based on our own view of the value of Brophy's life, since we do not approve of an analysis of State interests which focuses on Brophy's quality of life. *Saikewicz, supra* at 754. See *Matter of Conroy, supra* at 367. The judge correctly disavowed pronouncing judgment that Brophy's life is not worth preserving.

The duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity. See *Matter of Dinnerstein,* 6 Mass. App. Ct. 466, 473 (1978). It is antithetical to our scheme of ordered liberty and to our respect for the autonomy of the individual for the State to make decisions regarding the individual's quality of life. It is for the patient to decide such issues. Our role is limited to ensuring that a refusal of treatment does not violate legal norms. *Erickson* v. *Dilgard,* 44 Misc. 2d 27, 28 (N.Y. Sup. Ct. 1962).

In this case, the State's concern for the preservation of the life of the patient is implicated. Here, Brophy is not terminally ill nor in danger of imminent death from any underlying physical illness. It is true, however, that his life expectancy has been shortened by his physical affliction. While the judge found that continued use of the G-tube is not a highly invasive or intrusive procedure and may not subject him to pain or suffering, he is left helpless and in a condition which Brophy has indicated he would consider to be degrading and without human dignity. In making this finding, it is clear that the judge

---

[29] Of course, the law does not permit suicide. See text, *infra* at 439. Thus, the law does not permit unlimited self-determination, nor give unqualified free choice over life.

failed to consider that Brophy's judgment would be that being maintained by use of the G-tube is indeed intrusive. Additionally, in our view, the maintenance of Brophy, as described at 427 & note 21, *supra,* for a period of several years, is intrusive treatment as matter of law.

No case in this Commonwealth has presented such a situation. For example, in *Saikewicz, supra,* we declined to force the use of highly invasive treatment or extraordinary measures in the case of a terminally ill patient. In *Matter of Dinnerstein, supra,* the Appeals Court allowed the entry of a no-code order in the case of a terminally ill patient suffering from Alzheimer's disease, who was being fed by use of a nasogastric tube. We approved of the decision in *Lane* v. *Candura,* 6 Mass. App. Ct. 377 (1978), where the Appeals Court refused to order a competent individual to have her gangrenous leg amputated — even though it would have saved her life. *Commissioner of Correction* v. *Myers, supra* at 263. In *Matter of Hier,* 18 Mass. App. Ct. 200 (1984), the Appeals Court refused to order surgery to reimplant a G-tube, an invasive procedure. Cf. *Matter of Spring, supra* at 640 (discontinuance of hemodialysis authorized).

A few States have decided cases with fact patterns similar to the one at hand. The leading case is the New Jersey Supreme Court decision in *Matter of Conroy, supra.* In that case the court would have refused to force a patient who had less than a year to live to endure the pain of a nasogastric tube used to supply nutrition and hydration, *id.* at 339, 365 (patient died while appeal pending in appellate division), *id.* at 341, rejected the distinction between active or passive treatment and stated that "the primary focus should be the patient's desires and experience of pain and enjoyment — not the type of treatment involved." *Id.* at 369. In rejecting this distinction, the New Jersey Supreme Court overturned the appellate division, which had held that, because provision of nutrition and hydration through a nasogastric tube was "ordinary" care, the patient must be maintained by the nasogastric tube. *Id.* at 372. The recent California case of *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127 (1986), reaffirmed the logic of *Barber* v.

*Superior Court,* 147 Cal. App. 3d 1006 (1983), and upheld the right of the patient, who was fully competent but hopelessly quadriplegic and in continual pain, to end the use of a feeding tube which had been inserted against her will. An intermediate Court of Appeals decision in Florida similarly authorized the cessation of artificial feeding by use of a nasogastric tube. *Corbett* v. *D'Alessandro,* 487 So.2d 368 (Fla. Dist. Ct. App. 1986) ("we see no reason to differentiate between the multitude of artificial devices that may be available to prolong the moment of death"). *Id.* at 371.

The Supreme Court of New Jersey has stated that the State's interest in preserving life "generally gives way to the patient's much stronger personal interest in directing the course of his own life." *Matter of Conroy, supra* at 350.[30] The Supreme Court of New Jersey did not consider the fact that a nasogastric tube is less invasive than hemodialysis or a respirator. The court concluded that the individual's interest in bodily integrity, which is weighed against competing State interests, is a constant value to be considered. *Id.* at 355. Both New Jersey and California courts consider the nature of the treatment part of the calculus of the individual's choice or judgment. See *id.* at 365-366; *Barber* v. *Superior Court, supra* at 1019-1020; *Bouvia* v. *Superior Court, supra* at 1143-1144. Although we have recognized that the invasiveness of the treatment sought to be terminated is an important factor to be considered in balancing the individual's and the State's interests, *Saikewicz, supra* at 744, *Commissioner of Correction* v. *Myers, supra* at 263, we agree with the New Jersey court's view that "the primary focus should be the patient's desires and experience of pain and enjoyment — not the type of treatment involved." *Matter of Conroy, supra* at 369.[31] In *Superintendent of Belcher-*

---

[30] The California courts are essentially in accord. See *Barber* v. *Superior Court, supra* at 1018, and *Bouvia* v. *Superior Court, supra* at 1137-1138.

[31] In *Corbett* v. *D'Alessandro, supra,* the court stated: "When, therefore, it may be determined by reason of the advanced scientific and medical technologies of this day that Life has, through causes beyond our control, reached the unconscious and vegetative state where all that remains is the

*town State School* v. *Saikewicz,* 373 Mass. 728, 738, 743-744 (1977), we spoke with approval of the distinction made by medical ethicists between extraordinary and ordinary care. The Supreme Court of New Jersey in *Matter of Quinlan,* 70 N.J. 10 (1976), had considered the distinction to have significance at that time in the medical community. We recognize that, more recently, such a distinction has been criticized. See, e.g., *Matter of Conroy, supra* at 371-372, citing President's Commission Report at 84-88.[32]

While we believe that the distinction between extraordinary and ordinary care is a factor to be considered, the use of such a distinction as the sole, or major, factor of decision tends, in a case such as this, to create a distinction without meaning. Additionally, to state that the maintenance of nutrition and hydration by the use of the existing G-tube is only ordinary is to ignore the total circumstances of Brophy's situation. He cannot swallow. The judge found that Brophy may be maintained by the use of the G-tube for "several years," the longest recorded survival by such means extending for thirty-seven years. Clearly, to be maintained by such artificial means over an extended period is not only intrusive but extraordinary.

A G-tube was inserted as a means of providing time for fuller determination of his prognosis. Insertion of the G-tube might be considered extraordinary care, while its maintenance

---

forced function of the body's vital functions, including the artificial sustenance of the body itself, then we recognize the right to allow the natural consequence of the removal of those artificial life sustaining measures." This position is consistent with the position of the President's Commission. See note 34, *infra.* Our Appeals Court has also rejected the supposed legal distinction between treatment and the provision, by artificial means, of nutrition and hydration. See *Matter of Hier,* 18 Mass. App. Ct. 200, 207 (1984).

[32] The President's Commission has also stated: "Life-sustaining treatment, as used here, encompasses all health care interventions that have the effect of increasing the life span of the patient. Although the term includes respirators, kidney machines, and all the paraphernalia of modern medicine, it also includes home physical therapy, nursing support for activities of daily living, and special feeding procedures, provided that one of the effects of the treatment is to prolong a patient's life." President's Commission Report at 3.

might be ordinary care.[33] Thus, had the guardian sought to preclude the surgical insertion of the G-tube, a court may well have upheld the patient's right to refuse such surgical intervention to prolong his life. See *Matter of Hier, supra.* Just as the distinction between extraordinary and ordinary arguably obscures the real issue,[34] so, too, the distinction between withholding and withdrawing treatment has no moral significance.[35] "Moreover, from a policy standpoint, it might well be unwise to forbid persons from discontinuing a treatment under circumstances in which the treatment could permissibly be withheld. Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die." *Matter of Conroy, supra* at 370. See *Barber* v. *Superior Court,* 147 Cal. App. 3d 1006, 1016-1019 (1983); Withholding or Withdrawing Life Prolonging Medical Treatment, Statement of the AMA Council on Ethical and Judicial Affairs, quoted in *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127, 1141 (1986). Cf. *Matter of Torres,* 357 N.W.2d 332, 339 (Minn. 1984). A person who "has a right to refuse treatment in the first instance [ ] has a concomitant right to discontinue it." *Satz* v. *Permutter,* 362 So.2d 160, 163 (Fla. App. 1978), aff'd, 379 So.2d 359 (Fla. 1980), quoted in *Bartling* v. *Superior Court,* 163 Cal. App. 3d 186, 194 n.4 (1984). In accord, President's Commission Report at 181-183.

Thus, we conclude that the State's interest in the preservation of life does not overcome Brophy's right to discontinue treat-

---

[33] In another sense, what was viewed as extraordinary care ten years ago might be considered ordinary care today.

[34] "As with the other terms discussed, defining and applying a distinction between ordinary and extraordinary treatment is both difficult and controversial and can lead to inconsistent results, which makes the terms of questionable value in the formulation of public policy in this area." President's Commission Report at 83. See *id.* at 87-88. See also *Matter of Conroy, supra* at 370-371.

[35] President's Commission Report at 61-62; 75, 77, 89; Lynn & Childress, Must Patients Always Be Given Food and Water? 13 Hastings Center Rep. at 17, 19, Oct. 1983.

ment. Nor do we consider his death to be against the State's interest in the prevention of suicide. He suffers an "affliction," *Saikewicz,* 373 Mass. at 742, which makes him incapable of swallowing. The discontinuance of the G-tube feedings will not be the "death producing agent" set "in motion with the intent of causing his own death." *Id.* at 743 n.11.[36] "Prevention of suicide is . . . an inapplicable consideration . . . . 'A death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient.' *Welfare of Colyer,* [99 Wash. 2d 114, 123 (1983)]." *Rasmussen* v. *Fleming,* 154 Ariz. 200,      (1986) (741 P.2d 667, 671 [Ariz. App 1986]). "[D]eclining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide. Refusing medical intervention merely allows the disease to take its natural course; if death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self-inflicted injury." *Matter of Conroy,* 98 N.J. 321, 350-351 (1985). See, in accord, *Bartling* v. *Superior Court, supra* at 196. *Bouvia* v. *Superior Court, supra* at 1114.

Last, we conclude also that, so long as we decline to force the hospital to participate in removing or clamping Brophy's G-tube, there is no violation of the integrity of the medical profession. The position we take in a case such as this is consistent with the view of sound medical practice taken by the representative bodies of the American Medical Association, the Massachusetts Medical Society,[37] and that of many ethi-

---

[36] We note that the probate judge concluded that the "State's interest in preventing suicide is not applicable to the Brophy matter."

[37] The position of the Massachusetts Medical Society is expressed in its resolution adopted July 17, 1985: "[T]he Massachusetts Medical Society recognizes the autonomy rights of terminally ill and/or vegetative individuals who have previously expressed their wishes to refuse treatment, including the use of intravenous fluids and gastrointestinal feeding by tube and that implementation of these wishes by a physician does not in itself constitute unethical medical behavior provided that appropriate medical and family consultation is obtained."

cists and physicians.[38] We now turn to consider briefly the position of the defendant hospital.

b. *The rights and duties of the hospital.* The hospital argues that it has no constitutional, statutory, or common law right to deny nutrition and hydration to Brophy so as to bring about his death.[39] The probate judge held that the hospital and its medical staff "should not be compelled to withhold food and water to a patient, contrary to its moral and ethical principles, when such principles are recognized and accepted within a significant segment of the medical profession and the hospital community." We agree. Neither G. L. c. 111, § 70E (1984 ed.), the Massachusetts patients' rights statute, the doctrine of informed consent, nor any other provision of law requires the

---

[38] See President's Commission Report, passim. See also *Rasmussen* v. *Fleming, supra* at 12-13, quoting from AMA Council on Ethical and Judicial Affairs statement of 1986:

> "Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life-prolonging medical treatment.
>
> "Life-prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversibly comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained."

Additionally, the probate judge found: "There are a significant number of physicians and medical ethicists and a significant segment of the hospital community who disagree concerning the issue of whether or not it is morally and ethically appropriate to withhold food and water from a patient in Brophy's condition, who is not terminally ill."

[39] No one cites us any authority to the contrary. Normally, the interest in preserving the integrity of the medical profession is discussed in terms of the impact that court-authorized removal or abstention from treatment will have on the medical profession and on medical ethics generally. *Saikewicz, supra* at 743-744. *Matter of Conroy, supra* at 351-353. In particular, in *Saikewicz, supra* at 744, we noted that it was "not necessary to deny a right of self-determination to a patient in order to recognize [such] interests." Whatever effect our decision will generally have on medical ethics, see *supra* at 439-441, it is clear in this case that we can preserve the ethical integrity of the hospital and its staff without impact upon any patient right of self-determination.

hospital to cease hydration and nutrition upon request of the guardian. There is nothing in *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), and its progeny which would justify compelling medical professionals, in a case such as this, to take active measures which are contrary to their view of their ethical duty toward their patients. See *Brandt* v. *St. Vincent Infirmary,* 487 Ark. 431, 436-437 (701 S.W.2d 103, 106-107 [Ark. 1985]). There is substantial disagreement in the medical community over the appropriate medical action. It would be particularly inappropriate to force the hospital, which is willing to assist in a transfer of the patient, to take affirmative steps to end the provision of nutrition and hydration to him. A patient's right to refuse medical treatment does not warrant such an unnecessary intrusion upon the hospital's ethical integrity in this case.[40]

*Conclusion.* Accordingly, we uphold that portion of the judgment which pertains to the hospital, but set aside that portion of the judgment which enjoins the guardian from authorizing a facility to remove or clamp Brophy's G-tube. A new judgment is to be entered ordering the hospital to assist the guardian in transferring the ward to a suitable facility, or to his home, where his wishes may be effectuated, and authorizing the

---

[40] Since we uphold the judgment of the probate judge on this point, we do not reach the question whether the motion to dismiss was properly denied. We do note, however, that the plaintiff properly might have petitioned the Probate Court for Bristol County, see G. L. c. 215, §§ 3, 7 (1984 ed.); G. L. c. 201, § 1 (1984 ed.), because that court was the situs of origin of Patricia Brophy's guardianship. Even if we were to consider the guardianship and the present action as one "case" within the meaning of G. L. c. 215, § 7, we would find ample support for considering the present action on appeal in spite of any defect in such jurisdiction below. Cf. *Anderson* v. *Anderson,* 354 Mass. 565, 567 (1968) (G. L. c. 215, § 7, found not applicable where first action sought separate support, and different from second action instituted in equity). We agree with the Probate Court judge that dismissing such an unusual and pressing guardianship case would triumph form over substance and mark a substantial injustice with unjustifiable delay to the benefit of no one. G. L. c. 215, 28 (1984 ed.). G. L. c. 231A, § § 1, 4 (1984 ed.).

guardian to order such measures as she may deem necessary and appropriate in the circumstances.[41]

*So ordered.*

NOLAN, J. (dissenting). The court today has rendered an opinion which affronts logic, ethics, and the dignity of the human person.

As to logic, the court has built its entire case on an outrageously erroneous premise, i.e., food and liquids are medical treatment. The issue is not whether the tube should be inserted but whether food should be given through the tube. The process of feeding is simply *not* medical treatment and is not invasive, as that word is used in this context. Food and water are basic human needs. They are not medicines and feeding them to a patient is just not medical treatment. Because of this faulty premise, the court's conclusions must inevitably fall under the weight of logic.

In the forum of ethics, despite the opinion's high-blown language to the contrary, the court today has indorsed euthanasia and suicide. Suicide is direct self-destruction and is intrinsically evil. No set of circumstances can make it moral. Paul Brophy will die as a direct result of the cessation of feeding. The ethical principle of double effect is totally inapplicable here. This death by dehydration and starvation has been approved by the court. He will not die from the aneurysm which precipitated loss of consciousness, the surgery which was performed, the brain damage that followed or the insertion of the G-tube. He will die as a direct result of the refusal to feed him. He will starve to death, and the court approves this death. See Bannon, Rx: Death by Dehydration, 12 Human Life Rev., 70 (No. 3, 1986).

---

[41] Even though a significant change in Brophy's condition is unlikely, the new judgment should, of course, include a provision for modification (as did the original judgment), should any significant change or developments ensue. See *Saikewicz, supra* at 730-731 n.3.

I pass over the glaring weakness in the evidentiary basis for the finding that Paul Brophy would decline provisions for food and water. The evidence that he knew the horrors of such a death is not present in this case, and without such evidence it can be argued persuasively that Brophy never made a judgment that food and water should be denied him.

Finally, I can think of nothing more degrading to the human person than the balance which the court struck today in favor of death and against life. It is but another triumph for the forces of secular humanism (modern paganism) which have now succeeded in imposing their anti-life principles at both ends of life's spectrum. Pro dolor.


LYNCH, J. (dissenting in part). This case turns on a fine balancing of competing interests. I disagree with the majority and believe that that balance tips in favor of continuing to provide nutrition and hydration to Paul Brophy.

Although I indorse the reasoning and careful scholarship of much of the majority opinion, and would reaffirm *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), today's decision goes beyond that pronouncement. My principal objection is that the State's interest in the preservation of life has not been given appropriate weight. In addition, unlike *Saikewicz,* the majority nullify, if only in part, the law against suicide.

The interest in the preservation of life consists of at least two related concerns. First, the State has an interest in preserving the life of the particular patient. Second, the State has a closely related interest in preserving the sanctity of all human life.[1] *Matter of Conroy,* 98 N.J. 321, 349 (1985). But see

---

[1] Maintaining the sanctity of life may well be the reason society invests the State with sovereign authority. As Hobbes relates in Leviathan, the life of man in the state of nature is "solitary, poor, nasty, brutish, and short" and is characterized by a "war of every man against every man." The social contract invests the sovereign with authority to end that war. Hobbes, Leviathan, in 23 Great Books of the Western World 85, 100-101 (R. Hutchins ed. 1952). Even in John Locke's less hostile view of the state of nature, the formation of the State is largely justified on the ground that it affords

Cantor, *Quinlan,* Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L. Rev. 243, 249 (1977). Those two concerns manifest themselves in a variety of ways, and represent traditional values in the law.

The majority recognize that the first concern is implicated in this case but fail to acknowledge significant concern for preserving the sanctity of all human life. The withdrawal of the provision of food and water results in particularly difficult, painful and gruesome death;[2] the cause of death would not be some underlying physical disability like kidney failure or the withdrawal of some highly invasive medical treatment, but the unnatural cessation of feeding and hydration which, like breathing, are part of the responsibilities we assume toward our bodies routinely. Such a process would not be very far from euthanasia, and the natural question is: Why not use more humane methods of euthanasia if that is what we indorse? The State has an interest in maintaining the public integrity of the symbols of life — apparent euthanasia, and an apparently painful and difficult method of euthanasia, is contrary to that interest.

---

protection for property. Locke, Concerning Civil Government, Second Essay, in 35 Great Books of the Western World 53 (R. Hutchins ed. 1952). Locke believed that a person's property right in his or her body is foremost among property rights. *Id.* at 30.

[2] Removal of the G-tube would likely create various effects from the lack of hydration and nutrition, leading ultimately to death. Brophy's mouth would dry out and become caked or coated with thick material. His lips would become parched and cracked. His tongue would swell, and might crack. His eyes would recede back into their orbits and his cheeks would become hollow. The lining of his nose might crack and cause his nose to bleed. His skin would hang loose on his body and become dry and scaly. His urine would become highly concentrated, leading to burning of the bladder. The lining of his stomach would dry out and he would experience dry heaves and vomiting. His body temperature would become very high. His brain cells would dry out, causing convulsions. His respiratory tract would dry out, and the thick secretions that would result could plug his lungs and cause death. At some point within five days to three weeks his major organs, including his lungs, heart, and brain, would give out and he would die. The judge found that death by dehydration is extremely painful and uncomfortable for a human being. The judge could not rule out the possibility that Paul Brophy could experience pain in such a scenario. Paul Brophy's attending physician described death by dehydration as cruel and violent.

Moreover, until this case, it was clear that the State's interest in life was to be balanced against the individual's right to privacy and bodily integrity. No case in this Commonwealth has ever construed the right to privacy and bodily integrity as more than the right to avoid invasive treatments and certain other bodily invasions under appropriate conditions. Today, however, the majority essentially equate the right to privacy and bodily integrity with a right to choose or refuse all bodily invasions. Thus, if an individual's choice would be to refuse treatment or care, it is not important that that treatment or care is minimally invasive (except to the extent that it factors into the individual's choice). The majority now go well beyond *Saikewicz* in following the Supreme Court of New Jersey's pronouncement that the primary focus should be on the patient's choices and not on the type of treatment involved. After today's decision, the finding of a substituted judgment essentially will be conclusive in the "balancing" process. Such a rule essentially has been adopted by both the California and New Jersey courts. See *Bouvia* v. *Superior Court,* 179 Cal. App. 3d 1127, 1137-1138 (1986); *Barber* v. *Superior Court*, 147 Cal. App. 3d 1006, 1019 (1983); *Matter of Conroy, supra* at 355.

In upholding a substituted judgment decision to refuse nutrition and hydration, this court and the California and New Jersey courts have not been willing to take the final step and rule directly that the right to privacy and bodily integrity entails a (limited) right to die. Cf. *Bouvia* v. *Superior Court, supra* at 1146-1148 (Compton, J., concurring). Massachusetts law has not heretofore acknowledged a right to die emanating from the right to privacy, but now, in essence, it does. Under *Saikewicz* and its progeny, the invasiveness of the procedure sought to be terminated was an important factor to be considered in assessing the strength of the State's interest in preserving life against the individual's rights. For all intents and purposes, this element has been eliminated and the *Saikewicz* "balancing test" is all but chimerical once it has been discerned what the individual's choice would be. It is not enough to retreat behind the argument that discerning degrees of invasiveness would be difficult.

In *Saikewicz, supra* at 738, 743-744, we did speak with approval of the medical ethics distinction made between extraordinary and ordinary care — a distinction we perceived as having been recognized as extant in the medical community by the New Jersey Supreme Court in *Matter of Quinlan, supra* at 47. The majority now join those who are critical of this distinction. The validity of the criticisms aside, they are not telling against an evaluation of procedures according to their invasiveness. Here it is clear that the continued use of a G-tube presents few risks, no surgery, no pain or discomfort, and is minimally invasive; it is hardly more invasive than letting air into the room so that a patient can breathe. While the degree of invasiveness involved in a particular medical regimen may present issues of difficult line-drawing, this is not such a case.

Second, it appears that the majority have refused to overrule *Saikewicz* directly and to rule in favor of a constitutional right to die, so as to avoid the obvious conflict with the law against suicide. The State has an interest in the prevention of suicide. The underlying State interest in this area is the prevention of irrational self-destruction. *Saikewicz, supra* at 743 n.11. We have stated that an adult's refusing medical treatment is not necessarily suicide because "(1) in refusing treatment the patient may not have the specific intent to die, and (2) even if he did, to the extent that the cause of death was from natural causes the patient did not set the death producing agent in motion with the intent of causing his own death." *Id.* Here, Brophy is not terminally ill, and death is not imminent, and the judge specifically found that Paul Brophy's decision would be to terminate his life by declining food and water. The judge also found that "Brophy's decision, if he were competent to make it, would be primarily based upon the present quality of life possible for him, and would not be based upon the burdens imposed upon him by receiving food and water through a G-tube, which burdens are relatively minimal . . . ." Where treatment is burdensome and invasive, no such specific intent is normally at issue because, whether or not the patient seeks to die, the patient primarily seeks to end invasive or burdensome

treatment.[3] There is no question that the intent here is to end a life that is "over." Moreover, death here would not be from natural causes, i.e., causes he or his agents did not set in motion, but instead, the death producing agent would be set in motion by a volitional act with the intent to cause death.[4]

Suicide is primarily a crime of commission, but can, and indeed must, also be conceived as an act of omission at times. See *In re Caulk,* 125 N.H. 226, 228, 231-232 (1984) (suicide can be committed by starvation [or dehydration]). If nutrition and hydration are terminated, it is not the illness which causes the death but the decision (and act in accordance therewith) that the illness makes life not worth living. There is no rational distinction between suicide by deprivation of hydration or nutrition in or out of a medical setting[5] — both are suicide.

The State therefore has an interest in preventing suicide in this case that is greater than that in any previous case which has been before this court. The majority are apparently willing to recognize a limited right to commit suicide when an individual chooses to forgo life sustaining nutrition and hydration in a medical setting. The law against suicide predates our Constitution, and we should not nullify it without express legislation to this effect. *Commonwealth* v. *Mink,* 123 Mass. 422, 425-429 (1877).

A delicate case such as this calls for doctrinal exaction and for judicial restraint and caution. In an admirable effort to affirm individual autonomy and to authorize individuals to

---

[3] This is not a case where a patient subject to burdensome or invasive treatment seeks to end that treatment *and* seeks to die. Ordinarily, mere knowledge that death will invariably result from the withdrawal of treatment is not sufficient to show a specific intent to die.

[4] Contrast the situation of a person on a respirator or dialysis machine, whose failed respiratory system or kidneys is the problem that will cause death.

[5] Query: Do the majority recognize a right to die via starvation-dehydration if done at home, or elsewhere outside of a medical facility?

protect their humanity from the cruelty of fate, the majority have overlooked the limits of our power to accomplish such goals. A substituted judgment standard is our best legal tool to divine individual intent and to protect autonomous choice. But it would be an error of great magnitude to conflate a substituted judgment with an actual judgment. Such a mistake is a far greater blow against individual autonomy than it might at first seem. It is paternalism masquerading as the mere ratification of autonomous choice. Here, where Paul Brophy did not specifically advert to the choice which the majority now make for him, we should not be so quick to overlook the State's interests in protecting human life and the law against suicide. After all, those interests are handed to us from a tradition which seeks to protect human autonomy. In such a close case we should be cautious, and the course of caution here lies in the direction of preserving life.

O'CONNOR, J. (concurring in part and dissenting in part). I agree that the law of the Commonwealth does not require hospitals or medical professionals to take measures contrary to their ethical views concerning their duty to their patients. Therefore, I join the court in affirming that part of the judgment that pertains to the hospital. I sharply disagree, however, that the court should honor the choice, attributed to Brophy by a process of substituted judgment, that his G-tube be removed or clamped. Therefore, I do not join the court in so far as the court sets aside the injunction prohibiting the guardian from authorizing a facility to remove or clamp the tube. Furthermore, I do not join the court in ordering a new judgment designed to effectuate Brophy's supposed wishes. I would affirm the judgment below in its entirety.

The court's statement of the trial judge's findings concerning the choice Brophy would have made, were he competent, "to decline the provision of food and water and to terminate his life," *ante* at 427, is critically incomplete. The judge found (findings nos. 97 and 113) that Brophy's choice "would be to decline the provision of food and water, and *thereby* terminate

his life" (emphasis added). The judge deliberately used the word "thereby" to express his finding that Brophy's primary purpose in declining the provision of food and water would have been the termination of his life, entirely apart from any concern about the treatment's being intrusive. That fact is clear from the judge's further finding, also omitted from the court's opinion, that "Brophy's decision, if he were competent to make it, would be primarily based upon the present quality of life possible for him, and would not be based upon the burdens imposed upon him by receiving food and water through a G tube, which burdens are relatively minimal, inasmuch as the aforesaid treatment is neither painful nor invasive." (Finding no. 114.) Nowhere does the court acknowledge that the judge found on abundant evidence that Brophy would have chosen to decline food and water via the G-tube primarily because he wants to die, and not because of a lack of confidence that that procedure would be effective in prolonging his life, or because the procedure would be humiliating, painful, or otherwise burdensome. The omitted finding is crucial to an understanding of this case.

Unlike other cases, typified by *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), and *Matter of Conroy,* 98 N.J. 321 (1985), this case does not involve an individual's substituted choice to live for as long as possible without seriously burdensome treatment rather than to undergo such treatment in order to prolong life for a brief and uncertain time. Instead, this case raises for the first time in this Commonwealth the question whether an individual has a legal right to choose to die, and to enlist the assistance of others to effectuate that choice on the ground that, irrespective of the nature of available life prolonging treatment, life in any event is not worth living and its continuation is intolerable.

The court frames the issue as "whether the substituted judgment of a person in a persistent vegetative state that the artificial maintenance of his nutrition and hydration be discontinued shall be honored." *Ante* at 419. The court's statement of the issue, like its statement of the facts, fails to reflect the judge's finding, binding on this court, that Brophy's choice would not

be to avoid treatment he would consider burdensome or ineffective to prolong his life, but, instead, would be to die. Sound analysis requires a precise statement of the issue. In light of the judge's findings, the precise issue in this case is whether the court shall honor the substituted judgment of a person in a persistent vegetative state that the artificial, *effective, and non-burdensome* maintenance of his nutrition and hydration be discontinued by others *in order to bring about his early death.* Suicide is the termination of one's own life by act or omission with the specific intention to do so. Euthanasia is the termination of another's life by act or omission, with the specific intention to do so, in order to eliminate suffering. The court must consider whether on the facts of this case legal rights to commit suicide and euthanasia should be recognized. Such rights should never be recognized.

Surely, if one has a right to commit suicide, others have a right to assist him in doing so. The fundamental question, then, is whether the court should recognize a right to commit suicide. This court's explicit recognition of an individual's right to be free of nonconsensual invasion of his bodily integrity in *Harnish* v. *Children's Hosp. Medical Center,* 387 Mass. 152 (1982), in no sense implied recognition of a right to commit suicide. Nor was such a right recognized by this court in *Saikewicz* or by the Supreme Court of New Jersey in *Matter of Conroy.* In *Saikewicz, supra* at 753-755, this court held that Saikewicz's right of self-determination was superior to the State's interest in the preservation of human life, but in that case there was no suggestion that, were he competent, Saikewicz would have refused treatment specifically for the purpose of ending his life. In light of the facts of that case, this court noted that "[t]he interest in protecting against suicide seems to require little if any discussion." *Id.* at 743 n.11. The court's decision was not a recognition of a right to die, but rather was a recognition of Saikewicz's right to choose not to undergo treatment that, due to his own special characteristics and the nature of the treatment, would impose "heavy physical and emotional burdens . . . to effect a brief and uncertain delay in the natural process of death." *Id.* at 744. This court rested its

conclusion squarely on the uncertainty that the treatment would be effective to prolong Saikewicz's life, and on the "pain and disorientation [that would be] precipitated by the chemotherapy treatment." *Id.* at 754. This court firmly rejected the idea that withholding treatment would be justified on the ground that the quality of Saikewicz's life was unsatisfactory. *Id.*

The facts in *Matter of Conroy, supra,* parallel the facts in this case, with one major distinction. In *Matter of Conroy,* there was no finding, as there is here, that the ward's choice would be based primarily on the quality of life possible for the ward. As this court observes, *ante* at 435, "[i]n that case the court would have refused to force a patient who had less than a year to live to endure the pain of a nasogastric tube used to supply nutrition and hydration." Most important are the court's observations in *Conroy,* at 351, that "people who refuse life-sustaining medical treatment may not harbor a specific intent to die, *Saikewicz* . . . at 743 n.11 . . .; rather, they may fervently wish to live, but to do so free of unwanted medical technology, surgery, or drugs, and without protracted suffering. . . . Recognizing the right of a terminally ill person to reject medical treatment respects that person's intent, not to die, but to suspend medical intervention at a point consonant with the 'individual's view respecting a personally preferred manner of concluding life.' Note, 'The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State,' 51 N.Y.U. L. Rev. 285, 310 (1976). The difference is between self-infliction or self-destruction and self-determination. See Byrn, 'Compulsory Lifesaving Treatment for the Competent Adult,' 44 Fordham L. Rev. 1, 16-23 (1975)."

The court states here, *ante* at 433, that "the State's interest in preserving life is very high when 'human life [can] be saved where the affliction is curable.' *Saikewicz, supra* at 742. That interest wanes when the underlying affliction is incurable and would 'soon cause death regardless of any medical treatment.' *Commissioner of Correction* v. *Myers, supra* at 262. *Saikewicz, supra.*" It is true, of course, that if the proposed treatment will not be effective to prolong the patient's life, the State's concern for the preservation of life is not advanced by

its insistence on the treatment. The language quoted from *Saikewicz*, in context, says no more than that. Clearly, the court in *Saikewicz* did not suggest that the State lacks a legitimate interest in effective means being taken to prolong the life of one who is afflicted with a disease or disability, or that that interest depends on whether the disease is curable or the disability is correctable. Such a suggestion would have contradicted the court's firm rejection of a rule that "equates the value of life with any measure of the quality of life." *Id.* at 754.

In the instant case, the court states: "[W]e make no judgment based on our own view of the value of Brophy's life, since we do not approve of an analysis of State interests which focuses on Brophy's quality of life. . . . It is antithetical to our scheme of ordered liberty and to our respect for the autonomy of the individual for the State to make decisions regarding the individual's quality of life. It is for the patient to decide such issues." *Ante* at 434. The court's conclusion that Brophy's right to discontinue food and water is superior to the State's interest in preserving human life, *ante* at 439, appears, then, to be premised on the principle that everyone has an absolute right to commit suicide regardless of any assessment by the court of the quality of the life to be extinguished. If, indeed, that is a correct statement of the court's reasoning, it necessarily follows that the young as well as the old, the healthy as well as the sick, and the firm as well as the infirm, without exception, have the right to commit suicide, and that others have the right to participate in that act. Such a principle surely departs radically from the policy and tradition of this Commonwealth heretofore and should not be acceptable to a civilized society.

The court makes its own assessment of Brophy's condition as "helpless." *Ante* at 434. It may be, therefore, that the court does not rely exclusively on Brophy's own evaluation of the quality of his life, and that the court's evaluation is indeed a relevant factor. If that is the case, then the rule for the future is that the court will determine on a case by case basis whether the quality of life available to the individual who chooses to die justifies a State interest in protecting that life. Whether the

court is establishing an absolute legal right to commit suicide or a right that depends on judicial measurement of the quality of the life involved, neither principle is consistent with this nation's traditional and fitting reverence for human life.

Even in cases involving severe and enduring illness, disability and "helplessness," society's focus must be on life, not death, with dignity. By its very nature, every human life, without reference to its condition, has a value that no one rightfully can deny or measure. Recognition of that truth is the cornerstone on which American law is built. Society's acceptance of that fundamental principle explains why, from time immemorial, society through law has extended its protection to all, including, especially, its weakest and most vulnerable members. The court's implicit, if not explicit, declaration that not every human life has sufficient value to be worthy of the State's protection denies the dignity of all human life, and undermines the very principle on which American law is constructed. I would affirm the judgment below.