Hancock, Jr., J.
(concurring). I concur in the result reached by the majority and with its application of the Storar rule (Matter of Storar, 52 NY2d 363) to the facts of this case. In my view, however, there are serious deficiencies in Storar, making it particularly unrealistic and unsatisfactory for deciding cases involving circumstances more extreme than those presented here. I believe that a critical need exists for a change in the present New York rule — either through legislative action or judicial decision.
This case — while certainly involving grievous difficulties for the family and the physicians — does not, as I see it, entail an especially difficult application of our specific-subjective-intent rule, if that rule is applied strictly. The statements of the patient, while competent, are too general and imprecise to constitute the requisite clear expression of a present intention to forego artificially administered feeding in the existing circumstances. Moreover, I am quite confident that I would reach the same decision in this case under whatever reasonable standards might be adopted to replace our present rule, whether they constituted the "substituted judgment rule”, "best interests analysis”, "balancing of competing interests”, or some combination thereof (see, Note, In Re Quinlan Revisited, 15 Hastings Const LQ 479, 482-491; see generally, President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Biochemical Research, Deciding to Forego Life-Sustaining Treatment; Comment, In Re Storar: The Right to Die and Incompetent Patients, 43 U Pitt L Rev 1087; Moore, "Two Steps Forward, One Step Back”: An Analysis of New Jersey’s Latest "Right-to-Die” Decisions, 19 Rutgers LJ 955). The particular circumstances here — e.g., the patient is neither terminal, comatose nor vegetative; she is awake, responsive and experiencing no pain; and the prescribed procedure is relatively simple and routine — would weigh heavily in favor of continuing the medically assisted feeding under any of the approaches adopted by other state courts or recommended in the pertinent literature.
But there are, I believe, several reasons why the present *536 New York rule — requiring a factual finding of the patient’s actual intent and precluding the exercise of judgment, in her best interests and on her behalf, by her physician and family, a court or guardian — is unrealistic, often unfair or inhumane and, if applied literally, totally unworkable.
The rule posits, as the only basis for judicial relief, the court’s finding by clear and convincing proof of a fact which is inherently unknowable: what the incompetent patient would actually have intended at the time of the impending life-support decision. What is required here is not a finding of intent as the term is used in its fictional sense as, for example, to express the legal conclusion of what the Legislature intended when it enacted a statute or what parties intended when they signed a contract. What the rule literally demands is an impossibility: a factual determination of the incompetent patient’s actual desire at the time of the decision (see, e.g., majority opn, at 530 ["what the patient would say if asked today”]; dissenting opn, at 540 [Simons, J.] ["what does the patient desire done”]).
At best, the finding of "actual intent” required by the rule must be based on nothing more than a calculated guess as to what the incompetent patient would have thought if she were competent. But even if a wise and well-founded guess were assumed to be enough to constitute proof that is clear and convincing, the fact finder could still never satisfy the rule because it insists upon a finding of actual present intent. There is simply no way of excluding the possibility that the patient has had a change of mind so that her past statements do not indicate her present wishes (cf., Dresser, Life, Death, and Incompetent Patients: Conceptual Infirmities and Hidden Values in the Law, 28 Ariz L Rev 373, 379 ["people experiencing various life events, including set-backs in their physical and mental functioning, may revise their goals, values, and definitions of personal well-being”]).
No matter how much the Storar rule is stretched, or the clear and convincing proof requirement relaxed, so that Storar may be made to fit some particularly compelling situation, the rule’s fundamental flaws remain. Relief depends exclusively upon a showing of a present subjective intent, based upon the patient’s past oral or written statements unequivocally expressing her desire not to have artificial life support continued under specific circumstances. Where the patient has never expressed such thoughts or has not done so clearly, artificial *537 life support may simply not be withheld or withdrawn under Storar. Thus, even where the incompetent patient is completely and irreversibly comatose and vegetative (see, e.g., Matter of Quinlan, 70 NJ 10, 355 A2d 647) or, although not comatose or vegetative, in a terminal condition where further treatment would not only be futile but painful (see, e.g., Matter of Conroy, 98 NJ 321, 486 A2d 1209), life-sustaining procedures must, apparently, be undertaken and continued. (See, majority opn, at 530-531 ["the inquiry must always be narrowed to the patient’s expressed intent * * * no one should be denied essential medical care unless” the Storar evidentiary requirement is met (emphasis added)]; dissenting opn, at 540 [Simons, J.] ["his or her wishes must be ascertained”].)
Also, because the Storar rule ties the patient’s rights of self-determination and privacy solely to past expressions of subjective intent, thereby precluding any consideration of the circumstances, a dilemma of another sort can arise: whether an incompetent patient’s unequivocally expressed intent to decline life support. must be honored, even when clearly contraindicated by the relatively good health of the patient or other existing circumstances (see, majority opn, at 528 ["a hospital or medical facility must respect this right” (emphasis added)]; dissenting opn, at 540 [Simons, J.] ["courts are bound to recognize and enforce” the patient’s express wishes; a court "may not intrude into this area of personal autonomy and impose its paternalistic view of the patient’s best interests”]).
A court should be permitted, and indeed required, to consider a wide range of medical and personal factors before making a life-support decision in a particular case. Certainly among the most significant of these are: (1) the intention of the patient under the existing circumstances, to whatever extent it can be ascertained from past expressions; (2) any moral, ethical, religious or other deeply held belief, insofar as it might bear on the patient’s probable inclinations in the matter; (3) the medical condition of the patient, including the level of mental and physical functioning and the degree of pain and discomfort; (4) the nature of the prescribed medical assistance, including its benefits, risks, invasiveness, painfulness, and side effects; (5) the prognoses with and without the medical assistance, including life expectancy, suffering and possibility of recovery; (6) the sentiments of the family or intimate friends; and (7) the professional judgment of the involved physicians.
*538 Obviously, no exhaustive list can be set forth here. Suffice it to say that any realistic and workable decision-making procedure — to safeguard both a patient’s right to refuse treatment and the State’s interest in preserving life — must recognize at least these crucial considerations. Indeed, while the Storar rule purportedly excludes any consideration but a patient’s past expressions of intent, the majority and dissenting opinions today — as well as this court’s opinion in Storar itself— clearly treat the surrounding medical and personal circumstances as highly relevant. Our extensive discussions and disagreements about these circumstances attest to that very fact (see, majority opn, at 523-527, 532-534; dissenting opn, at 543-546 [Simons, J.]).
I do not agree with the dissent that the majority opinion rests on its own substituted judgment. In my view, the Storar rule, strictly applied, leads by itself to the result reached today. I do agree with Judge Simons, however, that the better approach to life-support decisions entails a careful consideration of all the circumstances (see, dissenting opn, at 541-542 [Simons, J.]) — especially the above-mentioned factors which are typically applied under the various rules of other jurisdictions (see, e.g., Brophy v New England Sinai Hosp., 398 Mass 417, 429-440, 497 NE2d 626; see also, President’s Commission, op. cit., at 132-136; The Hastings Center, Guidelines on the Termination of Life-Sustaining Treatment and the Care of the Dying, at 27-28). I have little doubt that in many cases decision makers, whether consciously or not, are considering the circumstances, including the best interests of the patient, while ostensibly making the required determinations under Storar. The reality is that in some cases only a thorough consideration of all the relevant circumstances can lead to a proper result. Our rule should reflect this reality. It should also make relief possible where there are no unequivocal expressions on which a finding of specific-subjective-intent can be based.
As I perceive the majority decision, it adheres strictly to the Storar rule and, if anything, reinforces its rigid limitations. While I am fully in accord with the majority’s recognition of the State’s interest in preserving life as one of overriding importance, I believe that a more flexible rule, and one which does not circumscribe so narrowly the limits of legal conduct, is required. Only such a rule, in my opinion, can be applied satisfactorily — and with wisdom and sensitivity — by decision makers in legal proceedings, and by hospitals and physicians *539 who must daily face the exigencies of making life-support determinations in cases involving the terminally ill.*

 One unfortunate practical consequence of the Storar rule on decision-making by physicians and the families of terminally ill patients is discussed in a recent commentary: "[The Storar rule] could lead to an interference with the policies that the hospitals and physicians have used in dealing with these situations in the past. Since serious illness often renders a patient incompetent, the effect of requiring past expressions as to wishes concerning life-sustaining treatment could be far-reaching. The standard of proof was defined as 'clear and convincing’ and this may not be an easy standard to meet. Many individuals, especially younger people, do not tend to think about themselves in the stage of a terminal illness, or make their wishes known in a manner that will be seen as reliable evidence later. Certainly family and friends who have known an individual throughout his or her life can have some idea of what that individual would want. Physicians make life and death decisions as a part of their everyday job and it is their duty to keep the best interests of the patient at heart. Between the patient’s loved one, and the ethical standards physicians follow, with a decision reviewable by a hospital committee formed for that purpose in the event of conflict, it would seem as if a proper decision could be made [emphasis added]” (Comment, In Re Storar: The Right to Die and Incompetent Patients, 43 U Pitt L Rev 1087, 1105; see also, Moore, "Two Steps Forward, One Step Back”: An Analysis of New Jersey’s Latest "Right-To-Die” Decisions, 19 Rutgers LJ 955, 992; dissenting opn, at 541-542 [Simons, J.]).