Martha Sue DeGRELLA, by and through her Guardian Ad Litem, Homer PARRENT, III, Appellant,

v.

Joseph G. ELSTON, Appellee.

No. 92–SC–756–TG.

Supreme Court of Kentucky.

July 15, 1993.

Homer Parrent, III, Parrent, Vish & Smither, Louisville, for appellant.

Mary Z. Ceridan, Bill V. Seiller, Handmaker & Seiller, ACLU Cooperating Attys., David A. Friedman, Gen. Counsel, American Civ. Liberties Union of Kentucky, Louisville, for appellee.

Vincent F. Heuser, Jr., Louisville, James Bopp, Jr., Thomas J. Marzen, Daniel Avila, John Altomare, Indianapolis, IN, for amicus, Ethics & Advocacy Task Force.

Gerald Kirven, Louisville, for amicus, Kirven, Member of the Bar.

Laurance B. VanMeter, Stoll, Keenon & Park, Lexington, for amicus, Ky. Assoc. of Hospices.

Benjamin J. Lookofsky, Mayfield, for amicus, Jane Doe.

Charles J. Cronan, IV, Martha J. Hasselbacher, Stites & Harbison, Louisville, for amicus, Jefferson Co. Medical Soc.

Chris Gorman, Atty. Gen., Thomas J. Hellmann, Asst. Atty. Gen., Civ. Div., Frankfort, for amicus, Atty. Gen.

Edgar A. Zingman, Susan B. Turner, Carole D. Christian, Lori E. Raff, Wyatt, Tarrant & Combs, Louisville, for amicus, Kentucky Hosp. Assoc.

Ann E. Fade, Director of Legal Services, Choice in Dying, Inc., New York City, Patricia Walker Fitzgerald, Walker & Radigan, Louisville, for amicus, Choice in Dying, Inc.

LEIBSON, Justice.

This is the first of the so-called "right to die" cases, spawned by modern medical technology, to reach this Court.[1]

As a result of a tragic beating inflicted upon her on February 22, 1983, Martha Sue DeGrella (Sue) sustained an acute subdural hematoma causing severe brain damage for which medical treatment was of no benefit. She now languishes, slowly wasting away, in a persistent vegetative state at the Lyndon Lane Nursing Home in Jefferson County, Kentucky. She receives nourishment and water through a gastrostomy tube surgically implanted into her stomach. She breathes through a tracheotomy tube inserted into her throat. These medical devices have been in place since March 4,

---

[1]. The Coordinating Council on Life–Sustaining Medical Treatment Decision Making by the Courts, a project of the National Center for State Courts funded by the State Justice Institute, has written "Guidelines for State Court Decision Making in Life–Sustaining Medical Treatment Cases (Second Edition, 1992)." NCSC Publication No. R–135. These guidelines provide useful advice for trial courts to consider in future cases of this nature.

1983, with no significant possibility of improvement in her condition. With artificially supplied nutrition and hydration she may linger on many years in this condition. The doctors advise there is no "serious" report of a case where such a patient has recovered.

Martha Elston, Sue's mother, was appointed her daughter's legal guardian by Order of Jefferson District Court in October 1991, and in February 1992, she filed the within action, naming Sue as the respondent and asking the appointment of a Guardian Ad Litem to advocate Sue's interests. Her petition seeks a declaratory judgment acknowledging Sue's persistent vegetative state and asking the court to declare that "Martha Elston, as mother of Sue DeGrella, is permitted by Kentucky law to substitute her judgment for that of her daughter." Strictly speaking, Martha Elston, the petitioner, does not seek a court order to disconnect the gastrostomy tubes used to provide nourishment and water for her ward and daughter, but a court declaration that she, as Sue's mother and Guardian, has the right to direct such discontinuation. The petition alleges, and she has now proved to the satisfaction of the trial judge by clear and convincing evidence, that "if she [Sue] could speak, she would say, 'Let me go.'"

This case is not in court because there is a dispute between the family members as to the patient's wishes, or between the physicians as to the medical evidence. The case is before our Court because Sue's attending physician and the nursing home fear legal sanctions, administrative, civil or even criminal, should they carry out the wishes of the patient as expressed through her mother and legal guardian. Being thus concerned, they have advised the family they require court authorization before permitting or participating in the removal of the medical device which provides Sue with nourishment and water.

The Guardian Ad Litem did not file a response controverting the factual allega-

tions of the petition, all of which now have been proved at trial. Nevertheless, the Guardian Ad Litem attended the trial, which took place over a two-day period in July 1992, appropriately tested the witnesses by cross-examination, and after the trial submitted a final report in which he recommended "that the court deny the relief sought." He stated:

"Despite the horrendous situation in which the Elston family finds itself, your Guardian Ad Litem simply does not believe that there is anything in present Kentucky law which authorizes what the Plaintiff seeks...."

In Brief and oral argument the Guardian Ad Litem, who is now the appellant, has conceded that there is no dispute about (1) Sue's present condition, (2) the feelings she expressed as a competent adult about the subject at issue before this devastating condition was forced upon her, and (3) her medical prognosis. The court below decided that Sue DeGrella's mother and legal guardian,[2] has the right to direct her attending physician and the nursing home where Sue resides to disconnect the feeding tube that is maintaining her existence, and let her die. The Guardian Ad Litem challenges the legality of this decision, but fully agrees the facts are fairly stated in the trial court's Opinion.

Within the context of this case, the issues are: (1) whether there is a right to choose to die as well as a right to live; (2) whether a person who has clearly stated, as a competent adult, that she would choose to die if ever reduced to the conditions presented, retains the right to do so after a devastating injury has rendered her incompetent and left her in a persistent vegetative state; and (3) if the answers to these two questions are in the affirmative, whether the right she retains may be exercised through a surrogate, in this case Sue's next of kin and legal guardian.

In addressing these issues we must confront several sub-issues. If there is a right to choose to die in present circumstances:

2. Ironically, while Sue persists despite her condition, her mother (the petitioner) has died and Sue's brother, Joseph G. Elston, has now qualified as her legal guardian and has been substituted as appellee by Order of this Court.

(1) what is the impact upon such right of two statutes enacted in 1990, the Kentucky Living Will Act (KRS 311.622–.644) and the Health Care Surrogate Act of Kentucky (KRS 311.970–.986); (2) do statements made by a person when competent regarding the desire to forego medical treatment in the future under certain conditions provide an evidentiary basis for surrogate decision-making when the patient is rendered incompetent; (3) do the powers of a legal guardian or next of kin ever extend to authorizing the withdrawal of life prolonging medical treatment, even with a person in Sue's condition; and (4) to what extent, if any, should courts be authorized or required to play a role in the decision-making process?

■ There is one prefatory issue which we must address before embarking on this discussion lest our words be misunderstood as the first step onto a slippery slope, or misapplied by trial courts in future cases: that is the quality-of-life issue. As long as the case is confined to substitute decision-making by a surrogate in conformity with the patient's previously expressed wishes, the case involves only the right of self-determination and not the quality of life. However, as evidence regarding the patient's wishes weakens, the case moves from self-determination towards a quality-of-life test. At the point where the withdrawal of life-prolonging medical treatment becomes solely another person's decision about the patient's quality of life, the individual's "inalienable right to life," as so declared in the United States Declaration of Independence and protected by Section One (1) of our Kentucky Constitution, outweighs any consideration of the quality of the life, or the value of the life, at stake. Nothing in this Opinion should be construed as sanctioning or supporting euthanasia, or mercy killing. We do not approve permitting anyone to decide when another should die on any basis other than clear and convincing evidence that the patient would choose to do so. This was the decision of the trial court in this case, and it is this decision which we affirm.

The trial court's Findings of Fact, Conclusions of Law and Judgment, entered September 3, 1992, comprise some 49 pages and can hardly be summarized within the confines of this Opinion. Eleven witnesses testified, including Sue's mother, two brothers, a sister, her former husband, three doctors, the nursing home administrator, and two theologians. Irreversible brain damage has destroyed Sue's higher brain functioning. Only her brain stem continues to function, continuing to operate her respiration and heart. With continued feeding she may live many years. However, her brain and her body will continue to wither. She reacts only at a reflexive level, meaning she will withdraw from painful stimulus, but does not experience pain by cognitive thought. Ceasing the nutrition and hydration will cause no pain, although, likewise, continuing treatment causes no pain. With the withdrawal of the feeding tube, all signs of life will expire in about ten to twelve days.

The finding of the trial court, supported by the uncontroverted medical evidence, is:

"The provision of nutrition and hydration by way of a gastrostomy tube is found to be an artificial intrusion into the body of Sue DeGrella and under the circumstances of this case is deemed by the Court to be an extraordinary measure utilized to perpetuate her life signs."

The trial court found by "clear and convincing evidence" that the proof sustained the allegations of the Complaint, both as to the medical facts regarding Sue's condition and prognosis and as to her choice as she expressed it to family members on different occasions and in different contexts; specifically, as the subject came up in conversation on various occasions, that if she were ever faced with a devastating injury or illness incapacitating her such as she is now incapacitated, she would want her treatment terminated rather than having her life prolonged by artificial means. As stated by the trial court:

"She repeatedly expressed the view that she would not want to be kept alive by artificial means. She found the plight of Karen Ann Quinlan and Quinlan's contin-

ued treatment to be abhorrent to her.[3] She hated any limitations on her abilities and she feared being reduced to being dependent on others. She went so far as to protest being put on a respirator after her second automobile accident, even though no question ever existed that she would recover."

While she never specifically stated that she did not want nutrition and hydration in the event she was in a persistent vegetative state, it would be unreasonable to require such a high degree of specificity on her part."

The trial court found that the respondent:

"... rejected during her life time and at times when she was competent the principle that life must be maintained at any cost. To the contrary she expressed explicitly on many occasions her desire that her life not be maintained if she would come to be under conditions which would require extraordinary means to preserve her life."

Based on this evidence the trial court held, inter alia:

"(6) The Petitioner, mother of the Respondent, as surrogate as well as next of kin, has the power to act in the stead of Sue DeGrella. In such capacity she may elect to direct the discontinuance of further life saving treatment on behalf of Sue DeGrella."

The question raised by this case is of profound public importance: can the trial court lawfully sanction the right of the legal guardian and next of kin of an incompetent person in a persistent vegetative state to terminate artificial nutrition and hydration? Thus, when the Guardian Ad Litem appealed the trial court's final judgment, we granted transfer.

At the outset, we note the appellant does not question the common law right of a competent person to forego medical treatment, either by refusal or withdrawal. As stated in *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891):

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of other, unless by clear and unquestionable authority of law."

This right was expressed by Judge Benjamin Cardozo, during his tenure on the high court of New York, as follows:

"Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 130, 105 N.E. 92, 93 (1914).

This same right was duly noted by our Court in *Tabor v. Scobee*, Ky., 254 S.W.2d 474 (1951), a suit against a surgeon who discovered that his patient's Fallopian tubes were infected and diseased during an operation for appendicitis, and who removed them without first obtaining the consent of the patient's stepmother who was nearby. Our Court held the facts stated constituted a cause of action against the surgeon even though the surgeon's treatment "was approved by the testimony of his professional colleagues" (*Id.* at 475); the patient, who was a minor, through her stepmother, had the right to decide whether she wished to undergo or refuse this medical procedure unless an immediate life-threatening emergency made it impractical for the surgeon to obtain the stepmother's consent before removing the patient's Fallopian tubes.

*Tabor v. Scobee* holds that the person with parental authority was to be consulted to obtain consent on behalf of her underage stepdaughter unconscious on the operating table. From this we infer that here Martha Elston had similar authority to refuse further medical treatment on behalf of her adult incompetent child, not in all circumstances, but in appropriate circumstances

3. *See In re Quinlan*, 70 N.J. 10, 355 A.2d 647, *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), a case highly publicized in the news media.

where there is no state interest in sustaining life specifically identified which is of sufficient importance to outweigh it. Certainly the facts in *Tabor v. Scobee* tear at the heart of the appellant's contention that, although a competent adult has a common law right to refuse or forego medical treatment or surgical intervention, no one has authority to engage in surrogate decision-making for an incompetent, as Martha Elston sought to do for her daughter in present circumstances.

The only other Kentucky case of which we have knowledge having any bearing on the issue presented is *Strunk v. Strunk*, Ky., 445 S.W.2d 145 (1969). *Strunk* was a petition by the mother of an adult, incompetent son, who had been appointed as his committee, asking the court to recognize her authority to authorize the transplant of this son's healthy kidney as a donor to his brother who was suffering from a fatal kidney disease.

"The [trial] court found that the [brother's] operation was necessary, that under the peculiar circumstances of this case it would not only be beneficial to [the donee] but also beneficial to [the incompetent donor] because [the donor] was greatly dependent upon [the donee], emotionally and psychologically, and that his well-being would be jeopardized more severely by the loss of his brother than by the removal of a kidney." *Id.* at 146.

Our Court affirmed the trial court, recognizing "the inherent power of the equity courts with regard to incompetents." *Id.* at 147. The decision engages the subject of "substitute judgment," refuting the Guardian Ad Litem's claim in the present case that the guardianship statutes do not specifically authorize a legal guardian to make personal decisions of this nature. In *Strunk* we state:

"The right to act for the incompetent in all cases has become recognized in this country as the doctrine of substituted judgment and is broad enough not only to cover property but also to cover all matters touching on the well-being of the ward." *Id.* at 148.

We quote from a legal treatise:

"Where legal disability of the individual is shown, the jurisdiction of the court is plenary and potent to afford whatever relief may be necessary to protect his interests and preserve his estates.... While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the court may pass upon purely personal rights." *Id.* at 147.

The operation contemplated in *Strunk* had no bearing on the *physical* well-being of the incompetent brother. Our court was approving the guardian's choice as to what would be "beneficial to Tommy" based on psychological and emotional considerations of the ward that outweighed physical health and mere survival. Again quoting from a treatise, the court referred for authority to an English case where the

"... Lord Chancellor permitted the allowance of an annuity out of the income of the estate of [a] lunatic earl as a retiring pension to the latter's aged personal servant" because the court was "'satisfied that the Earl of Carysfort would have approved if he had been capable of acting himself.'" *Id.* at 148.

■ The appellant cites us no authority to the contrary. The appellant relies solely on the failure of the Kentucky statutes related to guardianship to cover specifically the present situation. We view the statutes related to "Guardianship and Conservatorship for Disabled Persons," KRS 387.-500 et seq., as remedial rather than exclusive. These statutes intend to provide services for incompetent persons not only as specifically articulated but also as reasonably inferable from the nature of the powers of a guardian, which include in KRS 387.660:

"(2) To make provision for the ward's care, comfort and maintenance....

(3) To give any necessary consent or approval to enable the ward to receive medical or other professional care, counsel, treatment or service [with the exception of certain procedures which require court approval except in an emergency situation].

(4) To act with respect to the ward in a manner which limits the deprivation of

civil rights and restricts his personal freedom only to the extent necessary to provide needed care and services to him."

We quote from *Rasmussen by Mitchell v. Fleming*, 154 Ariz. 207, 741 P.2d 674 (1987), addressing the right of a guardian to terminate nutrition and hydration for a person in a persistent vegetative state:

> "A competent person clearly has the ability to exercise the right to refuse medical treatment. So, too, does an incompetent individual who has made his or her medical desires known prior to becoming incompetent. *Id.* at 685–86.
>
> . . . .
>
> The guardian ad litem argues that a guardian's right to consent to or approve medical treatment does not include the right to refuse medical treatment. . . .
>
> . . . .
>
> . . . 'Just as medical intervention is, in the majority of cases, clearly in the best interests of the ward, nonintervention in some cases may be appropriate and, therefore, in the ward's best interest.' " *Id.* 741 P.2d at 687.

First, we approve of the following quote from *Rasmussen:*

> "The consequences of a decision to terminate medical treatment will often be irreversible. Therefore, the court in any dispute will assume that the patient wishes to continue receiving medical treatment, and the burden to prove otherwise will rest on the party or parties desiring to terminate the treatment." *Id.,* 741 P.2d at 691.

We view "best interest," in present context, exclusively from the standpoint of the health and well-being of the ward and syn- onymous with the decision the ward would choose to make if conscious and competent to do so.

> "Under the substituted judgment standard, the guardian 'attempt[s] to reach the decision that the incapacitated person would make if he or she were able to choose.' . . . This standard best guides a guardian's decisionmaking when a patient has manifested his or her intent while competent." *Id.,* 741 P.2d at 688.

We do not go the next step, as the Arizona court did in the *Rasmussen* case, to decide that "best interest" can extend to terminating life-sustaining medical treatment where the wishes of the ward are unknown.

■ The position of the appellant is that "a guardian is a fiduciary and it is unthinkable that a fiduciary could properly act so as to bring about the ward's death." While we recognize that this argument has superficial appeal, the courts in seventeen of our sister states which have pondered the same issue presented here have not found it "unthinkable." Indeed, every state that has considered the matter has upheld the right of patients in a persistent vegetative state, through surrogates, to elect to withdraw such medical care: some courts based their decision on common law rights and some on common law viewed as constitutionally protected. These seventeen states are Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maine, Massachusetts, Minnesota, Missouri, New Jersey, New York, Ohio, Rhode Island, and Washington.[4] Most of these cases are covered in the Opinion of the United States Supreme Court in *Cruzan v. Director, Mis-*

---

**4.** The cases are: *Rasmussen by Mitchell v. Fleming,* 154 Ariz. 207, 741 P.2d 674 (1987); *Conservatorship of Drabick,* 200 Cal.App.3d 185, 245 Cal.Rptr. 840 (6 Dist.1988); *McConnell v. Beverly Enterprises–Conn., Inc.,* 209 Conn. 692, 553 A.2d 596 (1989); *In re Severns,* 425 A.2d 156 (Del.Ch.1980); *Corbett v. D'Alessandro,* 487 So.2d 368 (Fla.App.1986); *In re L.H.R.,* 253 Ga. 439, 321 S.E.2d 716 (1984); *In re Estate of Longeway,* 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); *In re Lawrance,* 579 N.E.2d 32 (Ind.1991); *In re Gardner,* 534 A.2d 947 (Me. 1987); *Brophy v. New England Sinai Hosp., Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986); *Matter of*

*Conservatorship of Torres,* 357 N.W.2d 332 (Minn.1984); *Cruzan v. Harmon,* 760 S.W.2d 408 (Mo. banc 1988); *In re Jobes,* 108 N.J. 394, 529 A.2d 434 (1987); *In re Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981); *Leach v. Akron Gen. Med. Ctr.,* 22 O.O.3d 49, 66 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Gray v. Romeo,* 697 F.Supp. 580 (D.R.I.1988); *In re Grant,* 109 Wash.2d 545, 747 P.2d 445 (1987).

We note that the Rhode Island case was decided in federal court, *Gray v. Romeo, supra,* and that the Indiana case, *Matter of Lawrance, supra,* was based in part on Indiana statutes.

*souri Depart. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The decisions reviewed in *Cruzan* reason that where the wishes of the patient are plainly manifest from statements made when competent, the right of self-determination should not be lost merely because an individual is no longer able to sense a violation of such right.

In every state, when the court has been persuaded of the wishes of the incompetent patient, the court has honored those wishes. In all but two states, Missouri and New York, even when the court has been unable to precisely determine the express wishes of the patient, it has allowed the patient's family, or the patient's guardian, to exercise substituted judgment as to what the patient would wish. The cases from Missouri and New York, *Cruzan v. Harmon,* 760 S.W.2d 408 (Mo. banc 1988) and *Matter of Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981), recognize the common law right to refuse treatment is retained by an incompetent, but require clear and convincing evidence that the incompetent person, while competent, expressed the desire that such treatment be refused in the circumstances presented. In the present case the trial court used "clear and convincing evidence" as the standard for making its decisions, so we need not decide whether a mere preponderance of evidence would have sufficed. Clear and convincing evidence was introduced, of both the patient's irreversible persistent vegetative state and the strength of the patient's commitment to the termination of life in such circumstances. Once we recognize the possibility of any circumstances where the right of self-determination of terminating medical treatment can still be exercised through a surrogate, the present circumstances qualify for its application.

■ The appellant contends the common law right of self-determination in, and informed consent to, obtaining medical treatment has been attenuated by legislative policy expressed in the Kentucky Living Will Act, *supra,* and the Health Care Surrogate Act of Kentucky, *supra,* to the extent that it can no longer be said to apply to an incompetent person in a persistent vegetative state. But neither of these statutes specifically applies to the present situation, and when we study them looking for a policy overriding the common law right to refuse medical treatment, they send mixed messages.

For example, the Living Will Act begins with a reaffirmation of the common law right, a legislative finding "that all adults have the fundamental right to control the decisions relating to their own medical care, including the decision to have medical or surgical means or procedures calculated to prolong their lives provided, withheld, or withdrawn." KRS 311.622(1). The statute goes on from there to specify one method by which a competent adult, through a "living will" as detailed in the Act, can "make a written declaration ... instructing the adult's physician to withhold or withdraw life-prolonging treatment in the event such person is diagnosed as having a terminal condition." KRS 311.622(2). But it does not purport to be exclusive, or to supersede common law rights.

KRS 311.624(5)(b) specifies that in a living will document executed pursuant to the statute " 'life-prolonging treatment' shall not include the administration of medication or the performance of any medical procedure deemed necessary to alleviate pain or for nutrition or hydration." But the argument that the limitations in the Living Will Act express a policy for situations beyond the scope of the statute is conclusively refuted by KRS 311.640, which specifies in subsection (1) that the Act "creates no presumption concerning the intention of an adult who has revoked or has not executed a declaration" using the Act, and in subsection (2) that the Act "shall not ... impair or supersede any common law or statutory right that an adult has to effect the withholding or withdrawal of medical care."

KRS 311.636, states that "[n]othing in [the Living Will Act] shall be construed to condone, authorize or approve *mercy killing* or *euthanasia,* or to permit any affirmative or deliberate act to end life *other*

*than to permit the natural process of dying."* (Emphasis added.) "Mercy killing" and "euthanasia" or any other "affirmative or deliberate act to end life" are fundamental violations of the common law. The key phrase is the last phrase, "other than to permit the natural process of dying," and this phrase explains, clarifies and limits what is meant by an "affirmative or deliberate act to end life." This phrase recognizes that the advances of medical technology have made it possible to sustain existence when life has ended except for the "natural process of dying." This is not an objective inquiry into the quality of life, but a subjective inquiry into whether the patient wishes the continuation of medical procedures to interdict "the natural process of dying."

The withdrawal of nutrition and hydration from a person in Sue DeGrella's state, irreversible brain damage and a prolonged period in a persistent vegetative state, is medically recognized as fitting the definition of "permit[ting] the natural process of dying" as documented by the evidence in the record before us.[5] We could not reach a different definition, even if we were so inclined, except by indulging in an abstract discussion about the "meaning of life" or "quality of life" that would substitute our personal opinions for the evidence introduced at trial as expressed through the findings of the trial judge.

■ Likewise, we find no special meaning in the bundle of rights legislatively provided by the "Health Care Surrogate Act of Kentucky," *supra,* that limits or contravenes the patient's common law rights in the present situation. This Act grants a person "with decisional capacity" the right to "designate" others "as a surrogate or successor surrogate to make any health care decision on behalf of the grant-

---

**5.** *See also, Guidelines for State Court Decision Making in Life–Sustaining Medical Treatment Cases,* National Center for State Courts, 2nd ed., 143–45 (1992). "It is important to note that a consensus has already developed on major medical-ethical issues relevant to LSMT (n. 248). They include the following:

(1) There are no significant distinctions between withholding or withdrawing (stopping and not starting) LSMT.

(2) The use of terms such as 'terminal illness,' 'terminal condition,' and 'imminently dying' often create more confusion than clarity in LSMT decisions. Regardless of the patient's condition, the overriding concerns for the health-care provider in the forgoing of LSMT are: (a) respecting patient autonomy (self-determination), and (b) improving patient well-being (the weighing of benefits and burdens of one plan of care in comparison with alternatives).

(3) Health care professionals have a duty to promote the welfare of their patients. However, this does not necessarily include the duty to preserve life at all costs. Where LSMT fails to promote a patient's welfare, there is no longer an ethical obligation to provide it, and treatments no longer beneficial to the patient may be stopped.

(4) LSMT can take many forms, from something as simple as a penicillin pill to something as complex as a respirator, depending upon the patient's circumstances. It is these circumstances that are important in making LSMT decisions and the potential to benefit the patient, and no labels such as 'extraordinary,' 'ordinary,' and 'heroic,' which are of little value in actually making the LSMT decision. Indeed, they tend to confuse the decision making.

(5) Artificial nutrition and hydration are forms of medical treatment; in general, their use or discontinuation should be governed by the same principles and practices that govern other forms of medical treatment. Although issues involving artificial nutrition and hydration are often presented more emotionally, from a moral and legal standpoint, they raise the same questions as do other forms of medical treatment.

(6) There are significant moral and legal distinctions between letting die (including the use of medications to relieve suffering during the dying process) and killing (assisted suicide/euthanasia). In letting die, the cause of death is seen as the underlying disease process or trauma. In assisted suicide/euthanasia, the cause of death is seen as the inherently lethal action itself.

(n. 248) The major articulated LSMT medical-ethical standards include: American Academy of Neurology, *Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistent Vegetative State Patient* (1988); American Geriatrics Society, *AGS Position Statement: Medical Treatment Decisions Concerning Elderly Persons* (1987); Council on Ethical and Judicial Affairs of the American Medical Association, *Withholding or Withdrawing Life–Prolonging Medical Treatment* (1986, 1989); The Hastings Center Guidelines, *supra* note 9; President's Commission Report, *supra* note 9; U.S. Congress, Office of Technology Assessment, *Life–Sustaining Technologies and the Elderly* (1987)."

or, excluding the right to withhold or withdraw artificial nutrition and hydration," except

"[w]hen the burden of the provision of artificial nutrition and hydration itself shall outweigh its benefit, provided the determination of burden shall refer to the provision itself and not to the quality of the continued life of the person." KRS 311.978(3)(c).

It is difficult to interpret what the statute means by the word "burden" for a person in a persistent vegetative state. We need not decide for a person like Sue DeGrella who has clearly stated, while competent, that should she ever be reduced to a condition such as she is now in, she would want treatment terminated. Sue has established that for her "the burden of the provision of artificial nutrition and hydration ... outweigh[s] its benefit."

In any event, the Health Care Surrogate Act, just as the Living Will Act, specifies that it supplements rather than limits common law rights. In KRS 311.984(5) it states that the Act "shall not ... impair or supersede any common law or statutory right that an adult has to effect the withholding or withdrawing of medical care."

Having determined that neither the Living Will Act nor the Health Care Surrogate Act intends or attempts to contravene or supersede Sue DeGrella's common law rights, we need not, and do not, extend this Opinion by addressing constitutional questions which would arise if the contrary were so. Constitutional questions would arise only if these Acts were interpreted as a legislative effort to impair rights of self-determination or personal autonomy which the constitution protects. Several of the decisions from our sister states have recognized constitutional protection for the right of the incompetent individual in Sue DeGrella's circumstances to have nutrition and hydration withdrawn through the process of surrogate decision-making, usually based on protection of a constitutional right of privacy. That question is moot in this case because, as we interpret the acts of the General Assembly, they leave common law rights intact.

■ Now we turn our attention to the evidence question. As previously stated, the Guardian Ad Litem questions how Sue's prior statements against being maintained on an artificial life-support system, no matter how credibly attested to by other persons, may constitute a legal basis for a surrogate decision-maker ("whether a guardian, a family member or a judge") to later decide to terminate life-prolonging medical treatment. He presents no authority in point. Instead he argues: (1) an analogy to statutes which, in some instances require written proof of an action taken before it can be given effect, statutes such as KRS 394.040, the requisites of a valid will; and (2) the possibility the now incompetent person may have experienced an unknown change of heart after having voiced the choices her family is now trying to effectuate.

The analogy to the formalities required in the making of a will is unsound because the right to refuse or terminate medical treatment, unlike the power to devise property by will, does not come from the state. It inheres in a person's right of self-determination in the choice of medical treatment, and as yet the state has not attempted to interfere in its exercise.

As to the more difficult question, the evidentiary value of past statements of preferences to govern subsequent treatment decisions, these comments made by Justice William Brennan fairly frame the issue:

"When a person tells family or close friends that she does not want her life sustained artificially, she is 'express[ing] her wishes in the only terms familiar to her, and ... as clearly as a lay person should be asked to express them. To require more is unrealistic, and for all practical purposes, it precludes the rights of patients to forego life-sustaining treatment." 497 U.S. at 324, 110 S.Ct. at 2875.

We recognize that previous oral statements cannot be considered conclusive in nature. The oral directives the patient gives to a family member, friend or health care provider are of significant value as a

relevant evidentiary consideration, but there are other evidentiary matters which may outweigh such statements, such as written directives to the contrary, reactions the patient voiced regarding particular types of medical treatment, religious beliefs and the tenets of that religion, or the patient's consistent pattern of conduct with respect to prior decisions about his own medical care. These considerations are discussed in *In re Conroy*, 98 N.J. 321, 361, 486 A.2d 1209, 1229–30 (1985). But the fact that other evidentiary considerations, where available, may outweigh oral statements does not rule them out as reliable evidence to guide surrogate decision-making, where such statements have been made as in the present case.

On the contrary, such evidence falls within the parameters of the exception to the hearsay rule now codified in the Kentucky Rules of Evidence, KRE 803(3), recognizing the admissibility of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition" where relevant to the issue at hand. For instance, in *L.K.M. v. Dept. for Human Resources*, Ky.App., 621 S.W.2d 38 (1981), a termination of parental rights case depending upon proof by clear and convincing evidence (the same standard used in the present case), the court said it was proper to use previous out-of-court statements of children offered to prove "intense fear" of their parents, even though the pertinent state of mind was at the time of trial. Likewise, in *Jefferson Standard Life Ins. Co. v. Hewlett*, 307 Ky. 171, 210 S.W.2d 352 (1948), an action to recover the life insurance proceeds on a person who had disappeared, our Court permitted the beneficiary to prove that the insured had previously expressed intentions to commit suicide. And in *Wilson v. Commonwealth*, Ky., 551 S.W.2d 569 (1977), our Court ruled that statements showing the deceased's previously expressed intention to kill the appellant should have been admitted as proof that the victim was the initial aggressor.

As stated in Lawson's treatise, *The Kentucky Evidence Law Handbook*, 3rd Ed., Sec. 8.50, p. 435 (1993):

"It is well-settled that relevancy of expressions of states of mind can exist without a concurrence in point of time between the making of the statements and states of mind required to be proved."

Sue DeGrella's statements of choice made before she became incompetent, while not dispositive of the question at hand, are competent evidence upon which a surrogate decision-maker could exercise substitute judgment in the circumstances presented.

■ We conclude the right to withdrawal of further medical treatment for a person in a persistent vegetative state exists within the framework of the individual's common law rights of self-determination and informed consent in obtaining medical treatment. In this Opinion we have recognized these rights can be exercised by an incompetent person through the process of surrogate decision-making so long as the wishes of the patient are known. The right to terminate medical treatment is not a power belonging to the judiciary to grant or withhold. The purpose of a declaratory judgment action is to judicially define the rights the parties already have, not to create new rights where none exist, or to withhold them. This case came to the trial court because the attending physician and nursing home would not recognize the patient's right to choose to refuse treatment through her surrogate, not because there is any law requiring the court's prior consent to the exercise of the patient's right. Courts are, and must be, open to decide cases where a controversy exists, including a controversy in a case of this nature. Controversy exists only when someone challenges the existence of a right or the facts to support its exercise. Here, the lawfulness of the act of withholding further treatment depends on the existence of the underlying facts that established the patient's condition, her wishes in such condition, and the irreversible nature of the condition.

The appellant does not challenge these facts; the appellant challenges the existence of the right even though the facts

exist, and we affirm the existence of such right. The subject matter of this action is not judicial power to terminate treatment, but Sue DeGrella's right to terminate treatment, a choice she made before she was reduced to her present state, and retained when this tragedy befell her. Thus, though the courts are open for such cases, if no one challenges the existence of the underlying facts, legal action is not essential to the exercise of the patient's right.

██ The question to be decided is a factual one, not a legal one. If the attending physician, the hospital or nursing home ethics committee where the patient resides, and the legal guardian or next of kin, all agree and document the patient's wishes and the patient's condition, and if no one disputes their decision, no court order is required to proceed to carry out the patient's wishes. Future criminal sanctions or civil liability turn not on the existence or absence of a court order, but on the facts of the case. Judicial intervention into private decision-making of this sort is expensive and intrusive. No liability attaches to a decision to refuse or withdraw treatment in a case of this nature once the necessary facts are established and carefully documented by the parties involved. On the other hand the court cannot absolve the parties from liability where the facts do not exist to support the action taken. A false or fraudulent, and collusive, decision is beyond the power of a court to approve before or after the termination of life-sustaining medical treatment.

Because of the advances in modern medical technology, the time has come for people to give serious consideration to their choices if a tragedy of this nature should befall them, to decide what they would want done in such circumstances, and to make their wishes known so that family and health care providers can respect their decision.

For the reasons stated, we affirm the judgment of the trial court.

STEPHENS, C.J., and COMBS and SPAIN, JJ., concur.

LAMBERT, J., concurs by separate opinion.

WINTERSHEIMER, J., dissents by separate opinion in which REYNOLDS, J., joins.

LAMBERT, Justice, concurring.

While I concur with the result achieved by the majority, I write separately to express my reservations with respect to dictum in the opinion and the potential created for an erroneous application of the legal principles involved.

The result here is compelled by the evidence. Kentucky and virtually every common law jurisdiction have long recognized the principle that a person has a right to refuse medical treatment. *Tabor v. Scobee*, Ky., 254 S.W.2d 474 (1951). From the evidence presented and as found by the trial court, it appears that Ms. DeGrella had on numerous occasions expressed the firmly held view that her life should not be prolonged artificially and that the normal process of dying be permitted to occur. As such, it makes little difference in this case as to what legal standard is applied for the outcome would be the same.

I am deeply concerned, however, that the majority opinion may be understood to authorize surrogate decision making or substituted judgment[1] as a legal standard whereby the judgment of a close family member or other person would prevail as to what the patient would have wanted even in the absence of a clear declaration of such by the patient. Such a standard is a significant step beyond merely allowing relatives, friends, medical personnel, or other credible sources, including writings, to report the wishes of the patient as expressed

---

1. At several places in the majority opinion, the phrase "substitute judgment" is utilized. In *Guidelines for State Court Decision Making in Life–Sustaining Medical Treatment Cases,* National Center for State Courts, 2nd ed., 187 (1992), this term is defined as follows:

"**Substituted Judgment (standard):** A legal standard for surrogate decisionmaking. By this standard, the surrogate makes the decision on the basis of what is known about the patient's personal values and preferences. Compare *best interest* [standard]."

prior to the time of incompetence. While it is obvious that substituted judgment for the termination of medical treatment is rife with the potential for abuse, a more fundamental objection is that the perceived moral and ethical values of the patient may be lost or significantly influenced by the values of the surrogate. Moreover, there is a substantial danger that "quality of life" considerations may leak into the analytical process. As it is commonly understood, substituted judgment would likely be so subjective as to undermine any confidence that the patient's wishes were being truly observed. We should declare in this case that neither family members nor doctors and certainly not judges possess the power to authorize cessation of medical treatment in the absence of clear and convincing evidence that the stricken person had (not would have) expressed the desire to avoid continuation of life in a persistent vegetative state.

While the majority has established "clear and convincing evidence" as the standard for decision making, I remain uncertain as to whether this standard applies to assessment of the patient's medical condition or determining the patient's wishes with respect to discontinuation of medical treatment. While the majority is correct in saying that the evidence here is clear and convincing with respect to both questions, we should state unmistakably that such evidence with respect to the patient's wishes must be present whenever discontinuation of medical treatment is contemplated.

My greatest misgiving about the majority opinion is in what appears to be its amalgamation of the relevant concepts: (1) dispositive declarations prior to incompetence and (2) substituted judgment. The majority has said:

> "Sue DeGrella's statements of choice made before she became incompetent, while not dispositive of the question at hand, are competent evidence upon which a surrogate decision-maker could exercise substitute judgment in the circumstances presented.

> "... In this Opinion we have recognized these rights [self-determination and informed consent] can be exercised by an incompetent person through the process of surrogate decision-making so long as the wishes of the patient are known."

I regard the foregoing as contradictory or misleading as substituted judgment is unnecessary in circumstances as prevail here where the wishes of the patient are known and evidenced clearly and convincingly. True substituted judgment would be necessary, if lawful, only when the wishes of the patient were not clearly ascertainable.

Finally, the majority has sought to prevent litigation in cases of this type by declaring that:

> "If the attending physician, the hospital or nursing home ethics committee where the patient resides, and the legal guardian or next of kin, all agree and document the patient's wishes and the patient's condition, and if no one disputes their decision, no court order is required to proceed to carry out the patient's wishes. Future criminal sanctions or civil liability turn not on the existence or absence of a court order, but on the facts of the case."

While I concur fully with this view, it must not be overlooked that all such persons are charged with the duty of rightly estimating the situation and upon failure to do so, may be held legally accountable. As this Court said in *Bailey v. Commonwealth*, 235 Ky. 173, 30 S.W.2d 879, 880 (1930), and reiterated in *O'Leary v. Commonwealth*, Ky., 441 S.W.2d 150, 155 (1969):

> "It is firmly established by decisions of equal authority that a criminal law is not unconstitutional [or void for vagueness] merely because it throws upon people the risk of rightly estimating a matter of degree which deals with fixed and actual, as distinguished from imaginary and unascertained, conditions."

The majority has accurately stated:

> "[T]he court cannot absolve the parties from liability where the facts do not exist to support the action taken."

Those who undertake to carry out the wishes of one in a persistent vegetative

state should be admonished to exercise the utmost good faith and absolute obedience to the directions which have been given by the patient.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because I believe the court system lacks the authority to grant the relief sought and the standard of proof required is not sufficiently high in this type of case.

This is an action for declaratory relief brought originally by Sue DeGrella's mother seeking approval to withdraw a feeding and hydration tube from her 44 year-old daughter who has been in a persistent vegetative state for approximately 10 years. The mother sought a declaration of rights to the effect that she would be permitted by Kentucky law to substitute her judgment for that of her daughter and that she has the right to direct the discontinuation of gastrostomy tubes used to provide nourishment and water to her daughter.

This case brings into sharp focus much of the current discussion about the so-called right to die. It is of great importance to define the terms of this case and its application both specifically and generally. There is an enormous difference between the withdrawal of food and water, also called nutrition and hydration and the withdrawal of medical treatment. In my view, the majority merges the concepts by stating that the artificial feeding of a patient by a tube amounts to extraordinary medical treatment. I disagree. Sue De-Grella is not really being treated, she is being maintained through nourishment.

Withdrawal of food and water will result in death by starvation or dehydration. There is a danger in an over generalization of the specific problem presented here and its application to a broad class of people and the potential consequences arising therefrom. We must carefully consider the classes of people who could possibly be affected by this decision. 1) Sue DeGrella and her family. 2) Those in nursing homes and the handicapped in similar situations. 3) The rest of the population of Kentucky who may face a similar situation in the future. In addition, there is the ever-present problem of factoring in the economic ingredient of public taxpayer funding of Medicare and medical support for those in nursing homes or in a persistent vegetative state.

Death is a very private and personal matter between the individual and the Creator. However, as with every other human event it has an impact on other people both direct and indirect, as well as immediate and remote. Human beings are endowed by their Creator with an independent free will. Such free will can be exercised freely, subject only to moral accountability. Courts and governments have no place in such an equation.

This decision is a purely secular one. However, certain ethical values are at the very foundation of our modern civilization. They are based on the moral law and expressed through the natural and civil law. It is always a struggle for the judicial system to properly resolve such weighty questions.

The problem presented here is how does a civilized society react when an individual is incompetent to express her own wishes and her entire family and medical and hospital support believes she should be allowed to die. The individual circumstances are indeed tragic and have caused the members of the DeGrella family great anguish. More than the individual case, this situation has the potential for establishing a rule of law that could be applied to other individuals similarly situated who would have a different reaction and approach. I believe that judicial intervention into private decision-making of this sort is expensive and intrusive. The right to terminate medical treatment is not a power belonging to the judiciary to grant or withhold. This case is here only because the attending physician and the nursing home would not recognize the wishes of the family to refuse nutrition through her surrogate or guardian. There is no law requiring prior consent by any court for the exercise of such a decision. There has long been a common law right to refuse medical treatment by a competent adult. This is a question of whether food and water provided by

a tube is an artificial means of life support. It is not medical treatment.

Sue DeGrella is unable to eat, chew or swallow. She receives food and water by means of a gastrostomy tube which has been surgically inserted in her abdomen. Without the use of the tube she would ultimately die by starvation or dehydration. She experiences no discomfort or any pain by reason of the use of the feeding tube. Although some medical literature has references to individuals who have recovered from this condition at least in part, the general medical opinion is that a persistent vegetative state is irreversible and one of the witnesses testified that her chances for recovery were infinitesimal but not nil.

Sue DeGrella did not execute what is now known as a Living Will pursuant to K.R.S. 311.624 or designate a health care surrogate pursuant to K.R.S. 311.978. She could not have done so prior to her injury because these statutes did not exist at that time.

In reaching a decision based largely on a judicial interpretation of public policy as expressed by the legislature I believe it is important to consider the existing Living Will legislation in order to determine such public policy in this case. The medical evidence indicates that Sue DeGrella is not terminally ill. She would not soon die because of her injuries. Even if she were terminally ill and had a Living Will, the remedy sought here could not be granted under the terms of that statute. The withdrawal of nutrition and hydration is not authorized in a terminal case and even where the statute with its precise requirements for execution has been followed, the only reasonable interpretation of the public policy supporting the statute is that such withdrawal must necessarily be inappropriate and unauthorized in circumstances where death is not otherwise imminent, as in this case. The Living Will Act applies only to terminally ill patients.

The absence of any statute in Kentucky directly on point increased the need to resort to a careful public policy analysis. An objective review of these statutes requires a logical conclusion that the withdrawal of food and water from a nonterminally ill comatose individual violates the public policy of this State.

K.R.S. 311.978(3) provides in part that nutrition and hydration "... always be provided." I believe this phrase captures the thrust of the legislative intention in the clear language expressed. In the 1992 regular session of the General Assembly, the so-called "No food and water" amendment offered to the Kentucky Living Will Statute was defeated. I believe this is further evidence that the General Assembly had a preference for providing basic necessities such as food and water.

In the circumstances of this particular case, it is very questionable if the prior statements of a now incompetent person can form a proper legal basis for a decision to withdraw nutrition and hydration from that person. There is almost unanimous testimony that Sue DeGrella had expressed her feelings against being maintained on an artificial life support system. It should be noted that none of the testimony indicated that she had specifically considered the question of the withdrawal of nutrition and hydration.

The fundamental legal issue is whether such verbal statements, regardless of the credibility of the witnesses who attest to them, can become the legal basis for the discontinuance of a life support system and specifically nutrition and hydration. This is not a new concern. *See Cruzan v. Harmon*, 760 S.W.2d 408 (Mo.1986); *In re Jobes*, 108 N.J. 394, 529 A.2d 434 (1987).

Matters of far less importance than death or life may not legally be based on purely oral expression. Such matters include: the enforceability of various contracts under the Statute of Frauds, K.R.S. 371.010; the prohibition against Wills other than in writing, K.R.S. 394.040. Of additional concern is the obvious impossibility to really know whether the patient ever had a change of heart, either expressed or unexpressed when actually faced with a life or death decision. Here there was repeated testimony about generalized opposition to artificial life supports by the patient before she suffered her injuries.

In addition, there is a technical legal argument that authority to withdraw life supports is governed by agency law. Oral authority such as testified to in this case, does not meet the requirements of a durable power of appointment pursuant to K.R.S. 386.093. The common law principle is that the authority of the agent terminates upon the incapacity of the principal. *Cf. Rice v. Floyd*, Ky., 768 S.W.2d 57 (1989). The seriousness of this situation must be balanced and reconciled with existing laws governing existing situations which apply to all persons.

In my view, under Kentucky law neither the guardian or the family of a nonterminally ill patient may use substituted judgment to make a decision which results in the death of the patient. I cannot agree that a substituted judgment standard exists in Kentucky because of *Strunk v. Strunk*, Ky., 445 S.W.2d 145 (1969).

As noted by the trial judge in his lengthy opinion, *Cruzan I supra*, stated that there was "... no principal legal basis which permits the co-guardians in this case to choose the death of their ward."

Kentucky law regarding the power of a guardian is expressed in K.R.S. 387.660(3). The authority of a guardian pursuant to the Kentucky statutes can only be exercised in limited categories for the purpose of achieving the life, health and appropriate care of the ward. A guardian is a fiduciary and it is difficult to understand any circumstances that would cause the death of a ward through the proper exercise of guardian responsibility. The right to refuse medical treatment in the case of a nonterminally ill person is a personal decision and is not the type of decision which a guardian appointed under Kentucky statutes may make on behalf of an incompetent.

Reliance on *Strunk, supra*, is of marginal value. This Court in a 4 to 3 decision held that a guardian could consent to the removal of one of the ward's kidneys for transplant to the ward's brother in order to save the brother's life. This case is based on entirely different facts. Here the act sought to be performed under the authority of the substituted judgment rule would result ultimately in the death of the ward. That was not the case in *Strunk*. I do not believe that the holding in *Strunk* is sufficient authority to authorize the withdrawal of food and water under the substituted judgment rule in this case. In addition, Strunk has been eroded by the enactment of K.R.S. 387.660(3).

Regardless of how sincere the witnesses and family are, or how much we can sympathize with them, I do not believe *Strunk* should be extended so as to permit death because another person or court believes that it is in her best interest. *See* Justice Steinfeld's dissent in *Strunk*.

In reviewing this type of case, there must be precise attention to the specific subject matter presented. The broad substantive issues connected with mercy killing or euthanasia, assisted suicide, or life-sustaining medical treatment, must be distinguished from the removal of essential food and water to the patient. If as a result of this decision Sue DeGrella's death ultimately follows, it will not be from being in a persistent vegetative state, nor from the effects of the vicious beating. She will die or be killed, as you prefer, by the inherently lethal action of withholding food and water. Probably that can be accomplished either by the surgical removal of the feeding tube, or by the withholding of food and water. The result is the same: death from starvation.

It could be argued that the long-term use of a feeding tube is an artificial intrusion, but the supply of food and water to one who is unable to supply themselves is certainly not artificial. Can a valid distinction be drawn between the feeding of a patient and the force feeding of an infant by a parent? This case is about an incompetent adult who cannot express her wish as to life or death and who did not so express a wish prior to her injuries.

This matter cannot be fully considered without reference to constitutional questions particularly in view of the recent decision in *Doe v. Cowherd*, 965 F.2d 109 (6th Cir.1992). In a case involving an incompetent, matters relating to the so-called

"right to die" also involve questions relating to the constitutionally protected right to live and to accept treatment.

As a ward of the State, Sue DeGrella enjoys the constitutionally protected right to live and to accept life-sustaining treatment that should not be deprived of her by anyone without due process of law or equal protection considerations.

In this case, the patient is an adult ward of Kentucky and because of her disabilities, receives state and federal payments for her care and treatment. Any decision to permit the discontinuance of nutrition or a delegation of that authority would be state action subject to constitutional restraint and review. *Cf. In re Longeway*, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); *In re Lawrance*, 579 N.E.2d 32 (Ind.1991); *In re Colyer*, 99 Wash.2d 114, 660 P.2d 738 (1983).

*Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), characterized the decision by a guardian to withdraw a feeding tube as a decision to terminate a person's life. There would be an obvious contradiction if Kentucky would attempt to avoid its statutory system to assist persons with disabilities as provided in 92 KAR 20:026 § 3(5)(a) and 907 KAR 1:022 § 3(2)(b) (1992). There is a very fine line in allowing death because of natural circumstances when assistance is abandoned and actively participating in the onset of death by withdrawal of support. Constitutional values relating to the patient's interest in life must be part of the decision-making process. *See The Due Process Right to Life in Cruzan and its Impact on Right to Die Laws*, 53 University of Pittsburgh Law Review 193, 208 through 212 (1992).

There is no doubt that the patient would have a right to refuse treatment and as such a voluntary refusal would be a waiver of her right to live in a legal sense. The law requires waivers of constitutional interests and other important rights be subject to very careful review. *Cf. Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Even though the right to live may not be absolute, it precedes the right to choose because the right to live is the ultimate right or the right to have rights. *Cf. Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J. Concurring Opinion).

It is asserted by one of the Amicus that approximately 900 medicaid residents of long-term care facilities in Kentucky receive nourishment and fluids through a feeding tube. Healthcare Financing Administration, U.S. Department of Health & Human Services, User defined Summary Report for User Selected Criteria: Total Number of Facilities and Residents with Assistance in Feeding, June 27, 1991. The treatment provided in this case may be considered on the same level with the treatment received by many other similarly situated people in this State.

The real problem with the analysis presented by the majority opinion lies in its potential application to future persons in a similar situation. The majority opinion apparently adopts the view that there are no significant distinctions between terminating food and water and withholding or withdrawing life-sustaining medical treatment. It is troubling that support for such an opinion is found only in a footnote that deals with medical treatment. I am not sure if this statement is to be considered as holding in this case or whether it is applicable to future similar situations.

Certainly there is room for consideration of the principle of double effect. Philosophically you may foresee the result but not intend it. The hard questions are those that require a choice between what is extraordinary means and what is ordinary means. Without question, it generally depends on the circumstances of each case. A competent adult could always refuse to accept medical treatment, but whether nourishment or food and water received through a tube may be placed in the same category as treatment is a significantly different question.

The Federal and State Constitutions provide limits on the decision by a guardian to change the current level of treatment for this patient to the degree which would result in her death. There should be a pre-

sumption that her present treatment served the patient's best interests in living because it sustained her life in a nonburdensome manner. Such a presumption should stand unless there is some compelling reason to override it. There should not be an arbitrary presumption that the patient would waive her right to live by rejecting her present treatment without producing sufficiently clear evidence of her prior refusal. There should not be any reduction in her interest in living based only on an assessment of her quality of life, but rather it should be evaluated on the benefits her treatment provides. How these considerations apply depend on various factors as raised in *Doe v. Cowherd, supra.*

In *Cowherd,* the U.S. Sixth Circuit determined that Kentucky law requires that the same level of due process given to defendants in criminal proceedings must be given in any other state proceeding involving the intentional deprivation of an individual's constitutionally protected interests. *See Denton v. Commonwealth,* Ky., 383 S.W.2d 681 (1964).

*Cowherd* held that Kentucky violated the constitutional guarantee of equal protection by using different procedural standards for persons with mental illness and those with mental retardation even though both classes were threatened with the same loss of constitutional interests. Kentucky applies the "beyond reasonable doubt" standard in civil proceedings affecting mental illness and it must apply the same criteria to mental retardation cases. Such a constitutional analysis applies in this case and in cases which may follow it.

The "beyond reasonable doubt" standard was used by the California Supreme Court in a commitment proceeding in which that court said the liberty against confinement is second only to life itself. *In re Hop,* 29 Cal.3d 82, 171 Cal.Rptr. 721, 623 P.2d 282 (1981). Certainly state actions threatening the life of a person or a ward should be conducted with at least as many protections, if not more, as are provided against state action threatening the liberty of a ward.

In Kentucky, the test whether the deliberations relating to the life or death decisions for this patient are "quasi-criminal" in nature. *Denton, supra.* Surely this patient and any others should be afforded the same constitutional protection given to an accused in a criminal prosecution. Therefore, the "beyond reasonable doubt" standard of evidence should be applied in this type of case. *See Messer v. Roney,* Ky.App., 772 S.W.2d 648 (1989).

In applying Kentucky law, the U.S. Sixth Circuit Court has indicated that the authority of a guardian to vindicate one interest of a patient must be carefully scrutinized if it potentially interferes with another interest of the patient. *Cf. Doe by Doe v. Austin,* 668 F.Supp. 597 (W.D.Ky.1986).

The legitimate interest of a patient to live did not suddenly disappear when her guardian, relatives, physician or hospital caregiver declared their intent to end treatment allegedly in pursuit of her wishes.

If the evidentiary standard is reasonable doubt for proving prior intent, it would necessarily prevent a surrogate waiver based on substituted judgment. *See Cruzan v. Director,* 497 U.S. at pp. 284–86, 110 S.Ct. at p. 2855.

In this case, it is troubling to read some of the expert testimony presented at trial. It is disturbing that one physician referred to this patient's life as "no longer meaningful" and that her continued care would weaken society's commitment to preserving "meaningful" lives. Other testimony was to the effect that she was "dead" and "no longer a person" because she no longer reflected a divine image; and other testimony that even if she is alive, there is no "medical benefit" to continuing her care. Such sworn statements demonstrate this type of patient's vulnerability and raise serious concern that a decision not to treat could be based on unconstitutional biases against persons with disabilities.

If a patient is to die from refusal of food or fluids, then this should be an informed choice and not as a result of a decision rendered without appropriate due process and equal protection considerations. There is much that we do not know or understand

about life in general or life under such distressing circumstances as presented here.

The contemporary media-driven culture refers to this as a "right to die" case. It is an easy phrase and simple to remember but difficult to apply. There is a false premise inherent in it which assumes that human beings have a choice regarding death. As noted by one of the Amicus in this case, the real issue is whether persons may chose between allowing disease to proceed naturally to death or delaying ultimate death by medical intervention.

It is interesting to note that in the Federal *Cruzan, supra,* case the court found that her statements to others regarding her desire to live or die under certain conditions were unreliable for the purpose of determining her intent and insufficient to support a claim for substituted judgment. In *Cruzan,* Justice Scalia delivers an excellent concurring opinion specifying the problems associated with this type of decision.

The guidelines suggested by the majority opinion by their very title relate to life-sustaining medical treatment. This is not such a case. It is a case about the withdrawal of a hydration system through which the patient receives nourishment and water. Food and water are basic human needs and the process of feeding is not medical treatment under any circumstances. *Cf.* Justice Nolan's dissent in *Brophy v. New England Sinai Hospital,* 398 Mass. 417, 497 N.E.2d 626 (1986); *Bannon, Rx: Death by Dehydration,* 12 Human Life Review., 70 No. 3 (1986).

The only state interest present in such a case is its interest in preserving life. There can be no transfer of that goal to a state interest in assuring that the patient's wishes are accurately determined. Primarily, the decision-making process should remain private and I believe that the judicial system should remain open to hear matters relating to the termination of life-sustaining treatment only when a dispute arises among the appropriate parties.

These cases must be limited to a specific and individual basis. The removal of tube feeding cannot be applied automatically to an entire class of patients such as the permanently unconscious. There are legitimate concerns by everyone in our society about the trend toward euthanasia or mercy killing and assisted suicide. The careful "beyond a reasonable doubt" standard might conceivably serve as a "stopper" on the "slippery slope" toward euthanasia and mercy killing. Our society cannot accept a culture of death, but rather a culture of life.

An extreme illustration of the "slippery slope" problem is presented in *Alexander, Medical Science under Dictatorship,* The New England Journal of Medicine, Vol. 241, No. 2 at 39 (July 14, 1949) and is noted in Footnote 11 in the majority opinion in *Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1993).

I believe that any judicial intervention is appropriate only in those individual and specific cases in which the family, the physician and the hospital cannot agree. In this case the trial judge used a "clear and convincing" standard. He should not be faulted for that because this was certainly a matter of first impression. I would not direct a "beyond a reasonable doubt" rule retroactively but only prospectively.

The development of standards in this type of situation is best left to the wisdom of the General Assembly. Reliance on Guidelines for State Court Decision-making in Life Sustaining Medical Treatment requires an expansion on the concept of medical treatment. In a representative democratic society, it is part of the legislative function to decide matters of public policy. Certainly, there could be no greater question of public policy than the matter of life-sustaining treatment or hydration. A variety of medical, ethical and philosophic considerations must be addressed when deciding such serious matters which affect each and every individual. The judicial system is better suited for the application and interpretation of the laws once they are established by a democratically elected legislative body.

Therefore, I must respectfully dissent from the decision enunciated in the majority opinion because I believe that the judi-

cial system lacks the authority to grant the relief requested and that the proper standard of proof should be "beyond a reasonable doubt."

REYNOLDS, J., joins in this dissent.